COMMUNITY TELEVISION OF UTAH,
INC., Community Cable of Utah, Inc.,
Utah Satellite, Inc., Wasatch Communi-
ty T.V., Inc.,

and

Connie R. Jones, Lynn F. Jones, Caroline
A. Snow, Ralph McCleary, Kay Ulrich,
Ed Ulrich, Wayne Williams, as individ-
uals and as representatives of a class of
persons similarly situated,

and

Home Box Office, Inc., Plaintiffs,

v.

Hon. David L. WILKINSON, Attorney
General of the State of Utah, individu-
ally and in his official capacity and as
a representative of the class of all per-
sons empowered to enforce the Cable
Television Programming Decency Act,
Defendants.

Nos. C 83–0551A, C 83–0581A.

United States District Court,
D. Utah, C.D.

April 10, 1985.

Bryan L. McDougal, Robert D. Sherlock, Patricia A. Rorke, and Steven H. Blum, Salt Lake City, Utah, for plaintiffs.

Donald B. Holbrook and LeGrand R. Curtis, Salt Lake City, Utah, and George H. Shapiro and James P. Mercurio, Washington, D.C., for plaintiff-intervenor Home Box Office, Inc.

Robert N. Parrish, Asst. Atty. Gen., State of Utah, Salt Lake City, Utah, and Charles A. Hobbs and Jerry R. Goldstein, Washington, D.C., for defendants.

The court accepted amicus briefs from Morality in Media, Inc., the Nat. Cable Television Ass'n, Inc., the F.C.C., and Citizens for Positive Community Values.

ALDON J. ANDERSON, Senior District Judge.

## INTRODUCTION

On April 20, 1983, the Utah State Legislature passed the Cable Television Programming Decency Act ("Cable Decency Act"). Utah Code Ann. §§ 76–10–1701 to –1708 (Supp.1983). The Act gives certain state officials authority to bring nuisance actions against anyone who continuously and "knowingly distributes indecent material within this state over any cable television system or pay-for-viewing television programming." *Id.* § 76–10–1703. The Act defines "indecent material" as follows:

a visual or verbal depiction, display, representation, dissemination, or verbal description of:

(a) A human sexual or excretory organ or function; or

(b) A state of undress so as to expose the human male or female genitals, pubic area, or buttocks, with less than a fully opaque covering, or showing of the female breast with less than a fully opaque covering of any portion below the top of the nipple; or

(c) An ultimate sexual act, normal or perverted, actual or simulated; or

(d) Masturbation

which the average person applying contemporary community standards for cable television or pay-for-viewing television programming would find is presented in a patently offensive way for the time, place, manner and context in which the material is presented.

*Id.* § 76–10–1702(4).

On April 21, 1983, the plaintiffs Community Television of Utah, Inc., Community Cable of Utah, Inc., Utah Satellite, Inc., and Wasatch Community TV, Inc. filed this action. Claiming that the Act infringes upon their first amendment rights, these cable operator plaintiffs sought declaratory and injunctive relief. They named Attorney General David L. Wilkinson as defendant in his individual and official capacities and as a representative of the class of state officials empowered to enforce the Act. Because the plaintiffs raised important constitutional issues, the Attorney General agreed not to enforce the Act pending resolution of this case.

The court consolidated the original action with a separate action brought by several cable TV subscribers and allowed Home Box Office, Inc. to intervene as a plaintiff. The court also accepted *amicus* briefs from

Morality in Media, Inc. and the National Cable Television Association, Inc. All plaintiffs moved jointly for summary judgment. The defendants opposed the plaintiffs' motion and filed a cross motion for summary judgment. The court heard oral argument on May 25, 1984 and took both motions under advisement.

As this court prepared to rule on the summary judgment motions, the United States Supreme Court handed down its decision in *Capital Cities Cable, Inc. v. Crisp*, —— U.S. ——, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). That case involved the scope of the states' powers to regulate cable TV. The parties were asked to submit briefs explaining how *Capital Cities* might affect the decision in this case. The court accepted *amicus* briefs on the same issue from the Federal Communications Commission, Morality in Media, Inc. and Citizens for Positive Community Values. On August 10, 1984, the court heard oral argument on the issues of federal pre-emption raised by the *Capital Cities* case.

After carefully considering both the pre-emption and first amendment issues, the court prepared to rule on the motions. In October 1984, Congress passed the Cable Communications Policy Act ("Policy Act"), a statute which changed the regulatory structure of the cable television industry. The court requested both sides to submit briefs explaining how the new law would affect the pre-emption issue. On November 13, 1984, the parties completed this briefing. Being fully advised, the court now enters this Memorandum Opinion and Order for Summary Judgment.

## I. FEDERAL PRE–EMPTION

### A. *The Capital Cities Case*

In *Capital Cities Cable, Inc. v. Crisp*, the U.S. Supreme Court considered whether Oklahoma could prevent cable television operators from retransmitting alcoholic beverage advertisements originally transmitted from other states. In a unanimous opinion the Supreme Court held that federal law pre-empted the Oklahoma ban. The Court found that the FCC had expressly pre-empted state regulation of the "operational aspects" of cable television. The FCC's exclusive power included authority to regulate the selection of signals cable operators may carry. In turn, the FCC gave state and local authorities responsibility to regulate various local incidents of cable operations. This local power included authority to grant franchises, delineate franchise areas, regulate the construction of cable facilities and maintain rights of way. 104 S.Ct. at 2702.

To support its conclusion, the Court invoked that branch of the pre-emption doctrine that rests on congressional intent. Pre-emption is effective "when Congress, in enacting a federal statute, has expressed a clear intent to pre-empt state law." *Id.* at 2700 (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). The Court noted that federal regulations pre-empt state law as effectively as federal statutes if the agency decision to pre-empt " 'represents a reasonable accommodation of conflicting policies' that are within the agency's domain." 104 S.Ct. at 2701 (quoting *United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). The Court found that the agency's intent was clear: "[o]ver the past twenty years, pursuant to its delegated authority under the Communications Act, the FCC has unambiguously expressed its intent to pre-empt any state or local regulation of [the] entire array of signals carried by cable television systems." 104 S.Ct. at 2701. This intent to pre-empt extended to power over both non-broadcast signals (commonly described as "pay cable") and retransmitted broadcast signals. *Id.* at 2702.

The Court also explained the reasoning supporting the Commission's pre-emption decision. The Commission values diverse programming, and it has tried to give households access to television services presently unavailable from local broadcasts. State and local regulation of program offerings would interfere with this federal regulatory scheme:

Consistent with its congressionally defined charter to "make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide and world-wide wire and radio communication service...," 47 U.S.C. § 151, the FCC has sought to ensure that "the benefits of cable communications become a reality on a nationwide basis." *Report and Order*, 54 F.C.C.2d, at 865. With that end in mind, the Commission has determined that only federal pre-emption of state and local regulation can assure cable systems the breathing space necessary to expand vigorously and provide a diverse range of program offerings to potential cable subscribers in all parts of the country. While that judgment may not enjoy universal support, it plainly represents a reasonable accommodation of the competing policies committed to the FCC's care and we see no reason to disturb the agency's judgment. And, as we have repeatedly explained, when federal officials determine, as the FCC has here, that restrictive regulation of a particular area is not in the public interest, "States are not permitted to use their police power to enact such a regulation." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 178 [98 S.Ct. 988, 1004, 55 L.Ed.2d 179] (1978); [other citations omitted].

*Id.* at 2705.

In *Capital Cities*, the Supreme Court did not explicitly consider whether state indecency regulations were pre-empted; the Court discussed program regulation in general. In their original pre-emption briefs, the plaintiffs relied on the Supreme Court's sweeping language and concluded that the FCC had pre-empted state indecency regulations. The defendants disagreed, arguing that indecency is a special area appropriately reserved for state regulation.

When Congress passed the new Policy Act, this question of FCC intent became moot. Before Congress enacted this statute, the courts had to rely upon FCC pronouncements to determine the scope of pre-emption. Better authority is now available. In the Policy Act, Congress precisely delineated the spheres of state and federal authority over cable television programming. Courts can now refer to congressional directives to determine whether state laws are pre-empted. The court therefore turns to the Policy Act to resolve the pre-emption issue.

### B. *The Cable Communications Policy Act of 1984*

██ The Cable Communications Policy Act of 1984 is the first federal statute to establish a comprehensive regulatory scheme for the cable industry. The provisions of the Policy Act relevant to this case concern the allocation of federal, state and local regulatory power. In the Policy Act, Congress refined the general presumption, announced in *Capital Cities*, that states have no power to regulate program content. In the section of the Policy Act entitled "Coordination of Federal, State and Local Authority" it states that any state or local act or regulation which is inconsistent with the provisions of the Policy Act is pre-empted and superseded. Cable Communications Policy Act § 636(c). The Policy Act retains exclusive federal regulatory power over program content in all but a few limited areas. The Act describes these areas explicitly:

> Any Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this title.

*Id.* § 624(f)(1).

To resolve the pre-emption issue, the court must determine whether the Policy Act "expressly provided" for the type of regulation enacted by the Utah Legislature.

### 1. *State Power to Regulate Programs Carried on "Special Access" Channels*

The Policy Act insures that certain parties unaffiliated with the cable operator will have access to the cable television medium. Under the terms of the Policy Act, cable operators must set aside a limited

number of channels for independent commercial, public, educational or governmental programs. The Policy Act expressly delineates the scope of state power to regulate program content on these "special access" channels. To begin its pre-emption analysis, the court turns to the question whether the Policy Act permits regulation of these special channels through the mechanism provided in the Utah law.

Section 612 of the Policy Act establishes commercial access channels. It requires that cable operators designate a certain number of channels for commercial use by persons unaffiliated with the operator. *Id.* § 612(b). These special channels are set aside to insure that cable systems carry information from a wide variety of sources. *Id.* § 612(a). To enhance the variety of programs available to the public, § 612 prohibits cable operators from editing programs carried on these channels. *Id.* § 612(c)(2).

Section 612(h) does allow state franchising authorities, in determining whether a cable service shall be provided, to consider these factors:

> Any cable service offered pursuant to this section shall not be provided, or shall be provided subject to conditions, if such cable service in the judgment of the franchising authority is obscene, or is in conflict with community standards in that it is lewd, lascivious, filthy or indecent or is otherwise unprotected by the Constitution of the United States.

*Id.* § 612(h).

Assuming *arguendo* that § 612(h) is constitutionally valid, it does not authorize the restrictions in the Utah Decency Act. The power preserved by § 612(h) is too limited for two reasons. First, § 612 only applies to a limited number of commercial channels which have special editorial restrictions. Utah's Cable Decency Act covers significant areas of cable program distribution outside the scope of § 612. Utah Code Ann. § 76–10–1702(2) (Supp.1983).

Second, the Policy Act disallows the type of regulation provided in the Utah law. Because cable operators cannot edit the programs carried on the special channels discussed above, the Policy Act forbids civil actions against cable operators concerning the content of those programs. *See* Policy Act § 638. Section 612(h) of the Policy Act authorizes a different form of regulation. It provides that, as to any commercial channels provided under this section, a cable service shall not be provided, or shall be provided subject to conditions, if the cable service in the judgment of the franchising authority is obscene, or is in conflict with community standards in that it is lewd, lascivious, filthy, or indecent or is otherwise unprotected by the United States Constitution. Section 612 therefore expressly pre-empts, rather than authorizes, the Utah law with regard to these channels.

A similar analysis applies to the special public, educational or governmental channels discussed under § 611 of the Policy Act. Under § 611, franchising authorities may require operators to designate a certain number of channels for public, educational or governmental use. *Id.* § 611(b). Cable operators may not edit the programs carried on these channels. *Id.* § 611(e). Like the special commercial channels discussed above, these channels enhance the variety of information received by the public. The regulatory scheme governing these channels parallels the scheme under § 612. The Policy Act forbids civil actions against cable operators concerning the content of programs on these channels. *See Id.* § 638. State authorities may regulate program content only through the franchise renewal process. *See Id.* § 624(d)(1). The Policy Act therefore expressly pre-empts the Utah law with regard to the channels designated under § 611.

### 2. State Power to Regulate Programs Carried on All Other Channels

Section 638 of the Policy Act delineates the scope of state power to regulate programs carried on all other channels. It is therefore the last section of the Policy Act that might arguably authorize the enforcement of the Utah law. Section 638 preserves certain federal, state and local

government powers to regulate the content of cable television programs:

> Nothing in this title shall be deemed to affect the criminal or civil liability of cable programmers or cable operators pursuant to the Federal, State or local law of libel, slander, obscenity, incitement, invasions of privacy, false or misleading advertising, or other similar laws, except that cable operators shall not incur any such liability for any program carried on any channel designated for public, educational, governmental use [under § 611] or on any other channel obtained under section 612 or under similar arrangements.

*Id.* § 638.

Hence, § 638 explicitly preserves state power to regulate obscenity. As both sides of this case agree, Utah's Cable Decency Act extends beyond "obscene" materials to regulate those termed "indecent." "Indecency" and "obscenity" are legal terms of art which have different definitions and different constitutional implications. *See infra* Part II of this opinion. The obscenity provision of § 638 therefore does not, by its terms, allow enforcement of Utah's Cable Decency Act, which regulates "indecency." The question here is whether the Cable Decency Act is one of the "other similar laws" which § 638 permits states to enact and enforce.

The list in § 638 is a classic collection of laws regulating expression which the Supreme Court has deemed unprotected by the first amendment. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (libel and slander); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (incitement); *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (invasion of privacy); *Virginia Pharmacy Board v. Virginia Consumer Counsel*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (false or misleading advertising). The plain purpose of § 638 is to preserve federal, state and local regulation of unprotected expression in the areas noted.

Upon examination, Utah's Cable Decency Act does not appear to fit within § 638 because "indecent" expression is not wholly unprotected speech. The very distinction between obscenity and indecency rests to a great extent upon the different levels of constitutional protection extended to both classes of expression. Indecency, which has been found subject to limited regulation under extremely limited circumstances, *see* Part II of this opinion, is conspicuously absent from the list of wholly unprotected expression contained in § 638.

Other sections of the Policy Act address indecency explicitly. These provisions make it evident that § 638 does not cover laws regulating indecency. Section 624(d)(2)(A) requires cable operators to provide lock boxes at the request of subscribers who wish to "restrict the viewing of programming which is obscene or indecent." Policy Act § 624(d)(2)(A). With a lock box a subscriber can control the particular programs viewed on his television set. As the court notes above, § 612(h) addresses indecency in a different context. These explicit indecency provisions strongly imply that Congress deliberately omitted indecency from the list in § 638. It is unlikely that Congress would accidentally omit indecency from § 638, which defines important areas of federal, state and local power, and remember to include indecency in other sections of the Act.

The legislative history of the Policy Act supports the conclusion that § 638 does not cover the Cable Decency Act. According to the House Committee Report, § 638 preserves state power to regulate "speech which may be held by the courts to be unentitled to constitutional protection (as discussed in relation to section 624(d))." H.R.Rep. No. 934, 98th Cong., 2d Sess. 95 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655, 4732. In discussing § 624(d), the Report makes a clear distinction between indecency and "unprotected expression." The Report notes that although the Supreme Court has validated

limited restrictions on indecency in the broadcast medium, courts have always found indecent expression protected in the cable television medium. Section 638 would only cover indecency if future court rulings held that indecency regulations are constitutionally valid as applied to cable:

The provision covers not only obscene speech, but other speech which may also be unprotected by the Constitution of the United States (such as "fighting words" and speech which presents a "clear and present danger" to the public order). This provision would also permit changing constitutional interpretations to be incorporated into the standard set forth in 624(d)(1), *should those judicial interpretations at some point in the future deem additional standards, such as indecency, constitutionally valid as applied to cable.*

The Committee notes that the Supreme Court has held with respect to over-the-air that broadcasting speech which is not obscene, but nevertheless is "indecent", may be subject to government-imposed time, place and manner restrictions due to the unique pervasiveness of the over-the-air broadcast medium. *FCC v. Pacifica Foundation,* 438 U.S. 726 [98 S.Ct. 3026, 57 L.Ed.2d 1073] (1978). The Committee does not intend to disturb the applicability of such restrictions with respect to that medium.

The Committee further notes that Federal courts have held when reviewing the facts under particular state statutes that an indecency standard may not be constitutionally applied to cable television. *Community Television of Utah v. Roy City,* 555 F.Supp. 1164 (D.Utah 1982); *Home Box Office Inc. v. Wilkinson,* 531 F.Supp. 987 (D.Utah 1982); *Cruz v. Ferre,* 571 F.Supp. 125 (S.D.Fla.1983).

H.R.Rep. No. 934, 98th Cong. at 69–70, U.S.Code Cong. & Admin.News 1984, pp. 4706–4707 (emphasis added). *See also* Part II of this opinion.

The defendants cite the remarks of Senator Goldwater and Representative Nielson for the proposition that Congress intended § 638 to cover indecency. Senator Goldwater and Representative Nielson disagree with the official House Report, claiming that indecency laws are "other similar laws" covered by § 638. 130 Cong.Rec. S14289 (daily ed. Oct. 11, 1984); affidavit of Howard C. Nielson. It is not certain from the circumstances that these men understood the clear legal distinction between obscenity and indecency when they made these comments. The Senator and the Congressman seem to characterize indecency as unprotected expression by stating that § 638 preserves state power to regulate it. *Id.* Yet as the analysis above indicates, indecency is not unprotected expression under existing precedent.

The court also notes that Senator Goldwater's comments were inserted in the Congressional Record rather than spoken in the Senate. *See* 130 Cong.Rec. S14289 (daily ed. Oct. 11, 1984); 124 Cong.Rec. 3676 (1978) (all unspoken prepared statements submitted for printing in the Record are preceded by a "bullet" symbol). In addition, some of Representative Nielson's remarks concerned a bill which Congress never enacted. *See* 130 Cong.Rec. H9342 (daily ed. Sept. 11, 1984). Other remarks concerned the final bill but missed being officially transcribed. *See* affidavit of Howard C. Nielson. Under the circumstances, and in view of the clear statutory pattern, the official House Report is a more reliable indicator of congressional intent than the sincere and thoughtful comments of these respected congressmen. Taken as a whole, the legislative history shows that § 638 does not preserve state power to regulate indecency.

In summary, the Policy Act links power with principle. The Policy Act preserves state power to regulate program content that the first amendment does not protect. If state regulations are unconstitutional, they are also pre-empted under the terms of the Policy Act. The final resolution of the pre-emption question necessarily requires a ruling on the first amendment issue. The court therefore proceeds to an-

alyze the constitutionality of the Cable Decency Act.

## II. FIRST AMENDMENT CONSIDERATIONS

### A. *The Overbreadth Doctrine*

The free speech clause of the first amendment to the Constitution of the United States provides "the indispensable condition of nearly every other form of freedom":[1] "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I.[2] The United States Supreme Court has the responsibility of defining the scope of this clause. Therefore, this court must be guided by Supreme Court precedent in resolving the issues presented.

The plaintiffs allege that Utah's Cable Decency Act violates the first amendment. They challenge the Cable Decency Act on its face, claiming that it is overbroad. In a democratic society which relies upon elected officials for most policy decisions, it is "strong medicine" for a court to invalidate a statute on its face. *See Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). It is therefore important for the court to explain the general circumstances under which facial invalidation for overbreadth is appropriate.

■ A law is overbroad "if it 'does not aim specifically at evils within the allowable area of (government) control, but ... sweeps within its ambit other activities that constitute an exercise' of protected expressive or associational rights." L. Tribe, American Constitutional Law § 12–24, at 710 (1978) (quoting *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940)). An overbroad law is void on its face; it need not be challenged "as

applied" to the particular facts of a case. *Id.*

■ Overbroad laws, for which facial invalidation is appropriate, have two characteristics. First, the overbreadth is substantial; protected activity must be a significant part of the law's "target." *Id.* at 711. The literal scope of many laws encompasses some protected expression. Yet unless the "target area" of these laws contains significant protected expression, they are not overbroad; they can only be challenged "as applied" to particular cases. *Id.*

Second, the unconstitutional applications of an overbroad law cannot be satisfactorily excised. *Id.* If a court can adopt a limiting construction which will omit unconstitutional applications, the law is not overbroad. In addition, a law is not overbroad if its constitutionally infirm sections may be struck down without "rewriting" it. *Id.* at 714, 717.

Facial invalidation is the appropriate cure for the "chilling effect" created by overbroad laws. By definition, an overbroad law addresses significant protected expression; protected activity is therefore deterred within the law's "target area." This deterrence injures first amendment rights even if a well intentioned prosecutor enforces the law only against unprotected activity. *See* Note, "The First Amendment Overbreadth Doctrine," 83 Harv.L.Rev. 853 (1970).

If Utah's Cable Decency Act is overbroad, facial invalidation is therefore the appropriate remedy. This is true even though it may be difficult for courts to judge whether particular materials are indecent without a factual context. *See FCC v. Pacifica Foundation,* 438 U.S. 726, 742, 98 S.Ct. 3026, 3036, 57 L.Ed.2d 1073 (1978). The question whether particular materials are indecent is not before the court in this case.[3] Regardless of the particular appli-

---

**1.** *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).

**2.** This prohibition has been extended to the states through the 14th amendment. *De Jonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278 (1937).

**3.** The defendants urge the court to view numerous examples of the type of material they represent is being broadcast over cable television. This is unnecessary for two reasons. First, the plaintiffs seek a declaratory judgment holding that the law is vague and overbroad. The court's holding obviates any need to determine

cations of the law, the court may strike it down on its face if its "target area" is too broad; a division of this court has already used this remedy twice to invalidate overbroad cable TV laws. *See Home Box Office, Inc. v. Wilkinson,* 531 F.Supp. 987 (D.Utah 1982); *Community Television of Utah, Inc. v. Roy City,* 555 F.Supp. 1164 (D.Utah 1982).

With the foregoing guidelines in mind, the court must now proceed to determine whether the Utah law is overbroad and void on its face.

### B. *The Facts*

Few facts are relevant to a facial challenge, because the law at issue is not analyzed in a factual context. The defendants acknowledge that the only evidence material to a facial challenge concerns the Decency Act itself, its legislative history and the Attorney General's Opinion regarding it. Defendants' Response to Plaintiffs' Motion to Strike at 5 n. 4 (filed Nov. 16, 1983). The plaintiffs agree that the material facts in this case are extremely limited. *See* Memorandum of Plaintiffs in Support of Their Motion to Strike (filed Nov. 7, 1983). From the memoranda presented in this case, the court believes that there is no genuine issue of material fact concerning the question whether the Decency Act is facially unconstitutional.

In their amended filings, the parties have presented 37 paragraphs of factual allegations, including objections made. These amended filings effectively superseded prior statements of fact and mooted the motion to strike filed on November 7, 1983.

Some of these paragraphs contain facts that are immaterial to the question of facial validity. Paragraphs 34 through 37 purportedly contain descriptions of excerpts from films shown on HBO or Showtime and opinions regarding the character of the films and the need to prosecute. The state has not yet charged anyone with illegal distribution of any of these particular

films; this evidence is immaterial to a facial challenge. Paragraph 24 discusses the vote on S.B. No. 309 overriding the Governor's veto. This evidence is also immaterial to the constitutional issue before the court. Paragraphs 29 through 33 concern the practice of scanning, HBO contracts, cable operators' ability to delay movie showings, advertising practices and rating methods. These factual allegations lack verification and the showing of competency and personal knowledge required by Rule 56 of the Federal Rules of Civil Procedure. Even if the court were to overlook these procedural deficiencies, this evidence is immaterial to the issue before the court.

The parties disagree about other facts without creating any genuine or material factual issues. Paragraphs 25 through 28 concern cable industry growth, the general manner of cable program distribution, the monopolistic effects of cable systems and the extent of lock box use. The plaintiffs object to the relevance and materiality of these paragraphs but otherwise take only limited exception to the facts. In addition, there is no source provided to support the claims in detail. The court is of the opinion that the degree of difference between the parties is of no material importance in resolving the issue before the court.

The court has considered the remaining factual allegations, contained in paragraphs 1 through 23, for such assistance as they may provide in understanding and construing the Decency Act. Paragraphs 1 through 18 contain undisputed facts relating to the legislative history of the Act, the Attorney General's advisory opinion interpreting the Act, the parties involved, the claims made and the nature of the cable TV industry. Paragraphs 19 through 23 refer to the legislature's Cable Television Intent Statement, including selected excerpts from individual legislators.

### C. *The Miller Test*

The overbreadth doctrine evidences the United States Supreme Court's grave con-

---

whether each proffered example is indecent under the statute. Second, defendants have undertaken no enforcement action and therefore it is

unnecessary to view examples of what the defendants characterize as indecent.

cern for the protection of first amendment rights. In *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the Court held that obscenity is not protected by the first amendment. However, the difficulty came in articulating precisely what obscenity is. Although some thought that they knew obscenity when they saw it,[4] a comprehensive "definition" of obscenity did not emerge until 1973 in the case of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

In *Miller* the Court noted that "in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression. This is an area in which there are few eternal verities." *Id.* at 22–23, 93 S.Ct. at 2613–2614. The *Miller* Court required that state statutes be "carefully limited" so as not to intrude upon legitimate expression. *Id.* at 23–24, 93 S.Ct. at 2614–2615. Thus, the Court set forth a comprehensive three part test for obscenity:

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest [citations omitted]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Id.* at 24, 93 S.Ct. at 2615.

In order to be found obscene, the material challenged must meet all three of the prongs of the *Miller* test. Material that does not do so is by definition not obscene and therefore protected from obscenity

laws.[5] Utah already has an obscenity statute which comports with the requirements of *Miller. See* Utah Code Ann. § 76–10–1201 to –1228 (1978 & Supp.1983); *State v. Piepenburg*, 602 P.2d 702 (Utah 1979); *Piepenburg v. Cutler*, 649 F.2d 783 (10th Cir.1981). Yet the Cable Decency Act is broader. The statute regulates "indecent" material and does not limit itself to material that is legally obscene. It is evident that the Cable Decency Act does not equate indecency with obscenity.

■ In view of the perspective given by *Miller*, the statute is overbroad for two reasons. First, the law does not address either prong (a) or prong (c) of the *Miller* test. The Decency Act does not require, as prong (a) does, that the material appeal to the "prurient interest." Further, the law does not require that the material, taken as whole, "lack serious literary, artistic, political, or scientific value," which prong (c) demands.

Second, some of the Utah statutory definitions fail to comply adequately with prong (b) of the *Miller* test. To fall within prong (b), material must depict or describe sexual conduct in a patently offensive way. Under the Utah statute material is indecent if it is patently offensive for the time, place, manner and context shown, whether or not the material depicts or describes sexual conduct. Cable Decency Act § 1702(4).

These are results that the *Miller* Court sought to avoid. The *Miller* Court balanced the interest of freedom of expression and the legitimate interest of the state in regulating materials that depict sexual conduct. *Miller*, 413 U.S. at 23–25, 27, 93 S.Ct. at 2614–2615, 2616. But the failure of the legislature to incorporate adequately

---

4. *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (concurring opinion).

5. As the Supreme Court noted in *Miller*, state laws "must be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, *and* which, taken as a whole, do not have serious literary, artistic, political, or

scientific value." *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973) (emphasis added). The *Miller* test is a three part test. *Smith v. United States*, 431 U.S. 291, 299, 97 S.Ct. 1756, 1763, 52 L.Ed.2d 324 (1977). Material is not obscene under *Miller* unless all three parts of the test are satisfied. *United States v. Tupler*, 564 F.2d 1294, 1297 (9th Cir.1977).

all three prongs of the *Miller* test means that protected speech may be prohibited. This is because cable TV operators would be subject to civil penalties plus costs and attorney's fees for distributing material that, taken as a whole, does not appeal to the prurient interest. These penalties would also chill distribution of material that may have serious literary, artistic, political, or scientific value. The first amendment seeks to protect these critical and substantial values. The Cable Television Programming Decency Act fails to incorporate these values and is therefore an unconstitutional regulation of cable television.

In addition, the statute's separability clause cannot save it from overbreadth. The Act as a whole fails to satisfy the *Miller* requirements. This Court cannot rewrite the statute to add in the *Miller* requirements for the legislature. The separability doctrine cannot save a statute which in significant respect fails to incorporate constitutionally mandated protections.

### D. *The Scope and Application of FCC v. Pacifica Foundation*

Defendants urge upon the court that *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), modifies *Miller*'s constitutional mandate. They argue that *Pacifica* expands the legitimate scope of state regulatory powers beyond the limits articulated in *Miller*. Defendants further contend that *Pacifica* established guidelines that the Utah Act follows.

### 1. *The Application of Pacifica to the Present Case*

*Pacifica* involved the broadcast of a recorded monologue delivered by the satiric humorist George Carlin before a live audience in California. The monologue, entitled "Filthy Words," contained language that both parties agreed was "indecent" yet not "obscene" as the Court defined that term in *Miller*. The respondent's radio station broadcast the monologue at 2:00 in the afternoon. A man who heard the broadcast from his car radio while driving with his young son complained to the FCC about the content of the monologue. *Id.* at 730, 98 S.Ct. at 3030.

The FCC considered the man's complaint and issued a declaratory order which provided that the radio station " 'could have been the subject of administrative sanctions.' " *Id.* Although the FCC did not impose formal sanctions, it placed the order in the station's license file for consideration at the time of license renewal. *Id.* The FCC noted that if it received additional complaints the Commission would decide if formal sanctions would be necessary. These potential sanctions included immediate revocation of the station's license, a cease and desist order, a fine, denial of license renewal or imposition of a short term renewal. *Id.* at n. 1.

In support of its declaratory order, the Commission argued that broadcasting is fundamentally different from other types of communication. Accordingly, broadcasting deserved different treatment from other forms of speech. Four reasons supported this rationale:

(1) children have access to radios and in many cases are unsupervised by parents; (2) radio receivers are in the home, a place where people's privacy interest is entitled to extra deference, [citation omitted]; (3) unconsenting adults may tune in a station without any warning that offensive language is being or will be broadcast; and (4) there is scarcity of spectrum space, the use of which the government must therefore license in the public interest.

*Id.* at 731 n. 2, 98 S.Ct. 3031 n. 2.

The respondent Pacifica Foundation challenged the decision of the Commission. In a plurality opinion the United States Supreme Court upheld the FCC.

Defendants assert that the holding in *Pacifica* controls the present case. The court disagrees for the following three reasons. First, *Pacifica* is subject to factual limitations. Second, subsequent authority specifically limits *Pacifica*. Third, fundamental differences between the broadcast medium and cable television require that

*Pacifica* not be extended to cable television.

a. *The Factual Limitations of Pacifica.*—The holding in *Pacifica* is narrow. The Court merely agreed that the FCC had the statutory authority to take note of past program content when deciding whether to renew a broadcast license. Although the FCC has no statutory power to "censor" broadcasts by excising indecent material before it is broadcast, it may impose sanctions by refusing to renew the license of stations who broadcast such material. *Id.* at 735–738, 98 S.Ct. at 3033–3035. The Court itself stressed the factual limitations of its holding:

> It is appropriate, in conclusion, to emphasize the narrowness of our holding. This case does not involve a two-way radio conversation between a cab driver and a dispatcher, or a telecast of Elizabethan comedy. We have not decided that an occasional expletive in either setting would justify any sanction or, indeed, that this broadcast would justify a criminal prosecution. The Commission's decision rested entirely on a nuisance rationale under which *context* is all important. The concept requires consideration of a host of variables. The time of day was emphasized by the Commission. The content of program in which the language is used will also affect the composition of the audience, and differences between radio, television, and perhaps closed-circuit transmissions, may also be relevant.

*Id.* at 750, 98 S.Ct. at 3041 (emphasis added and footnote omitted).

Moreover, the concurring opinion viewed the holding even more narrowly. Justice Powell felt that "the Commission's order was limited to the facts of this case." *Id.* at 761 n. 4, 98 S.Ct. at 3047 n. 4. This view is supported by what the Court allowed. The Court deferred to the FCC and relied on its expertise in regulating station licenses.

Because the factual basis of its holding is very narrow, *Pacifica* does not validate the Decency Act. Stressing that the material at issue was broadcast in the mid afternoon, *see id.* at 750, 98 S.Ct. at 3041, the Court did not approve regulation at all times of day. The Utah statute, under the circumstances stated therein, imposes a fine upon cable operators who distribute material outlawed by the statute at *any* time. The attorney general's guidelines purport to allow adult material to be presented from midnight to 7:00 a.m. These guidelines do not cure the constitutional infirmity. *See* discussion *infra* at 1114–1115.

Furthermore, the Court only approved a very mild penalty. The FCC did not immediately revoke the station's license, issue a cease and desist order, impose a fine, deny license renewal or impose a short term renewal. The penalty imposed was only a notation of the complaint in the station's license file. This penalty may have had no impact on the station's day to day operation, other than to cause the station to broadcast the monologue in the evening. *Id.* at 760, 98 S.Ct. at 3046 (concurring opinion).

The Utah Act subjects the cable operators to a potential fine of $1,000 for the first offense and escalates to $10,000 for a second offense as well as reasonable costs and attorney's fees for distributing material outlawed by the statute.[6] Although the cause of action is not technically criminal, it does establish an increased penalty for repeated showings and is manifestly intended to deter distribution of indecent material. The sanction in *Pacifica* was far less punitive and chilling. The Commission's action caused Justice Powell to write: "since the Commission may be expected to proceed cautiously, as it has in the past, [citation omitted] I do not foresee an undue 'chilling' effect on broadcasters' exercise of their rights." *Id.* at 761–62 n. 4, 98 S.Ct. at 3046–47 n. 4. The *Pacifica* Court was closely divided, with four Justices dissenting and two concurring. If the penalty had been greater the result in the case may

---

**6.** Utah Code Ann. § 76–10–1704 (Supp.1983).

have been different. *Pacifica* cannot be read to allow all state and local governments to regulate cable content in accord with their respective views of indecency by imposing civil fines.

b. *Subsequent Case Law Limits Pacifica.*—The narrowness of the holding in *Pacifica* is supported by the case of *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). *Bolger* is the only case since *Pacifica* in which the Supreme Court has authoritatively considered whether *Pacifica* applies to any medium other than broadcast. In *Bolger* the Court struck down a federal statute which prohibited the mailing of unsolicited advertisements for contraceptives. Justice Marshall, who dissented in *Pacifica*, wrote for the Court. He noted that "[o]ur decisions have recognized that the special interest of the federal government in regulation of the broadcast media does not readily translate into a justification for regulation of other means of communication." *Id.* 103 S.Ct. at 2884. According to the Court in *Bolger,* the ruling in *Pacifica* was justified because broadcasting was uniquely pervasive and "'accessible to children, even those too young to read.'" *Id.* (quoting *Pacifica* 438 U.S. at 748, 98 S.Ct. at 3040). But the Court felt that the "receipt of mail [was] far less intrusive and uncontrollable" than the broadcast in *Pacifica. Id.*[7] The Court refused to extend *Pacifica* to a medium other than broadcast. A reasonable inference may be drawn that the Court desired to limit *Pacifica* to its facts.

In addition, the Court in *Bolger* rejected arguments that are similar to claims that the defendants advance in this case. Defendants assert that some persons will be offended by some programs shown on cable television. Defendants' Amended Memorandum in Opposition to Plaintiffs' Joint Motion for Summary Judgment at 20 (filed Mar. 22, 1984). Further, the defendants assert that the Utah statute helps parents protect their children from exposure to indecent material. *Id.* at 26.

In *Bolger* the Court considered similar arguments. There the government advanced two justifications for the ban on the distribution of contraceptive advertising. First, some recipients of the advertising might be offended by it. Second, the statute aided parents' attempts to control the sex education of their children.

In rejecting the first justification, the Court explained that "[r]ecipients of objectionable mailings, however, may '"effectively avoid further bombardment of their sensibilities simply by averting their eyes."'" [citation omitted] Consequently, the 'short, though regular, journey from mail box to trash can ... is an acceptable burden, at least so far as the Constitution is concerned.'" *Id.* 103 S.Ct. at 2883. The logic of *Bolger* is inconsistent with defendants' claim that the first amendment allows civil nuisance fines to be imposed upon persons who distribute cable material to adult subscribers.

The Court also rejected the argument that the interest of parents in controlling the sex education of their children was sufficient to overcome the commercial speech rights involved. *Id.* at 2884. Although recognizing that the parental interest was substantial, the Court concluded that the prohibition that protected this interest was too restrictive and interfered with the rights of adults to receive this material. *Id.* Thus, the Court found unsolicited commercial mailings that contained contraceptive advertising protected by the first amendment. By authorizing fines that create a de facto ban of some cable material, the Decency Act imposes a restriction inconsistent with *Bolger* and far "more extensive than the Constitution permits, for the government may not 'reduce the adult population ... to [seeing] only what is fit for children.'" *Id.* (quoting *Butler v. Michigan*, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957)).

Furthermore, in *Bolger* the Court classified the unsolicited advertisements

---

7. The plaintiffs argue that cable television is also less intrusive and more controllable than broadcast. *See infra* Section D. 2 of this opinion.

for contraceptives as commercial speech. *Id.* 103 S.Ct. at 2880–81. Commercial speech is entitled to less protection than cable broadcasting,[8] yet the Court in *Bolger* rejected the rationales advanced by the defendants in the present case.

c. *The Fundamental Differences Between Cable and Broadcast Media Distinguish Pacifica From the Present Case.*— *Pacifica* validated limited regulation of indecency in the broadcast medium. The present case concerns regulation of a different medium. This is a significant distinction.

The physical scarcity of broadcast spectrum space justifies governmental regulation of the use of that space. "There is a fixed natural limitation upon the number of stations that can operate without interfering with one another." *National Broadcasting Co., Inc. v. United States*, 319 U.S. 190, 213, 63 S.Ct. 997, 1008, 87 L.Ed. 1344 (1943). The regulation of the broadcast medium is vital as a "traffic control" device. Licensing is required to avoid interference between stations; without governmental rationing of broadcast frequencies, chaos would result. *See id.*

It has long been established that the FCC's role as a "traffic controller" has included a duty to insure that broadcast licenses are used in the public interest. Broadcast frequencies are scarce public resources; this physical scarcity justifies allocation according to the public interest. *Pacifica* 438 U.S. at 731 n. 2, 98 S.Ct. at 3031 n. 2. The FCC's duties to protect the public interest justify limited program content regulation in the broadcast medium to insure the best programming for the most people. To promote this interest, the FCC has always had the power to review the content of completed broadcasts in deciding

whether to renew licenses. *See id.* at 735, 98 S.Ct. at 3033. The FCC's action in *Pacifica* was an exercise of this power. The limited regulation validated in *Pacifica* is therefore merely an extension of the long tradition of indirect content regulation accomplished through the license renewal process. *Pacifica* upheld a type of regulation appropriate to the unique characteristics of the broadcast medium.

Because of its special characteristics, broadcasting is the form of communication that has received the most limited first amendment protection. *Id.* at 748, 98 S.Ct. at 3039. In the cable medium, the physical scarcity that justifies content regulation in broadcasting is not present. The Court in *Pacifica* deliberately limited its discussion to the broadcast medium.

*Amicus* Morality in Media, Inc. argues that *Pacifica* applies to the present case because both broadcast and cable are "scarce media." Seizing on scarcity as the justification for broadcast regulation, *amicus* tries to prove that cable is a scarce medium. Because each locality generally only has one cable franchise, it is argued that cable television is "economically" scarce. *Amicus* claims that this "economic" scarcity, like the "physical" scarcity characteristic of the broadcast medium, justifies content regulation.

It is not clear from the record before the court whether the cable medium truly is scarce in the "economic" sense discussed above. Under the new Policy Act, states may allow as many or as few cable franchises as they choose. Policy Act § 621(a)(1). Yet even if the cable medium is "economically" scarce, this scarcity does not justify content regulation like that in the broadcast medium. *See, e.g., Home*

---

**8.** Commercial speech is subject to broader regulation than traditionally protected speech. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983). And despite the profit inherent in movies, books, magazines and newspapers, the Court has held that they are entitled to the complete panoply of first amendment protections. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02, 72 S.Ct. 777, 780–81, 96 L.Ed. 1098 (1952). Only

when the primary purpose of the speech is to sell another product is such speech characterized as commercial. *Valentine v. Chrestensen*, 316 U.S. 52, 55, 62 S.Ct. 920, 921, 86 L.Ed. 1262 (1942). The primary purpose of cable TV is not to sell another product; cable TV is the product, much like movies, books, magazines and newspapers. Thus, cable TV is not commercial speech within the Court's definition.

*Box Office, Inc. v. FCC,* 567 F.2d 9, 44–45 (D.C.Cir.1977). This is true because cable is not limited to a finite number of channels the way broadcasting is. The demand for cable services determines the number of cable channels. The number of additional channels, in a technical sense, is subject to extensive expansion. *See, e.g., Home Box Office, Inc. v. Wilkinson,* 531 F.Supp. 987, 1002 (D.Utah 1982). As a result, there is no danger of interference between channels. The government therefore need not "control traffic" by rationing channels. As long as the material carried on cable channels is protected by the Constitution, licensing authorities need not police the content of those channels in the public interest, because no physically scarce public resource is involved. The supply and demand of the market place will determine the type of programming that will be successful. The public interest in receiving diverse information, an interest which the market might not adequately respect, is protected by the new Policy Act. The "special access" channels established by the Policy Act guarantee a variety of programs. *See* discussion *supra* Part I of this opinion; Policy Act §§ 612, 611.

### 2. *The Application of Pacifica's Rationale to the Present Case*

Defendants attempt to show that *Pacifica*'s rationale applies to cable television. The Court's reasoning in *Pacifica* was twofold. First, broadcasting has a pervasive presence which might intrude into the home and violate an individual's right to be left alone. Second, children may easily obtain access to indecent broadcast material, undermining both the "government's interest in the 'well-being of its youth'" and parents' authority over their children. *Id.* 438 U.S. at 748–50, 98 S.Ct. at 3039–41.

a. *Interference with the Right of Privacy.*—Defendants argue that cable television is more pervasive than the FM radio broadcasting at issue in *Pacifica.* Therefore, defendants claim, indecency on cable

television can be regulated through civil sanctions. This analysis oversimplifies the *Pacifica* Court's decision. The Court did not say that pervasiveness by itself establishes a right to regulate protected expression. According to the Court, pervasiveness which *results* in an unwarranted intrusion upon one's right to be left alone justifies regulation of FM broadcasts. That is, the right to be left alone in one's own home outweighs the first amendment rights of those who wish to intrude into that home. *Id.* at 748, 98 S.Ct. at 3039.

The practical and critical distinction between *Pacifica* and the present case is apparent: cable television is not an uninvited intruder. As the FCC observed in its *amicus curiae* brief submitted to this court:

> First, cable is a subscriber medium, generally only available if the person who views it has affirmatively contacted the cable system and asked that a wire be brought into his home and attached to his television set. Without that voluntary act, there is no cable programming. Second, as to certain interstate-transmitted services, particularly as to entertainment channels such as HBO, Showtime, and the Movie Channel, a subscriber must usually pay a premium in addition to its subscriber fee in order to receive service. Otherwise, the signal is scrambled both aurally and visually, precluding reception in the home. Third, a subscriber may, if it so chooses, acquire a "lock box" which prevents reception of any particular cable programming without his authorization. [Fourth], television guides, providing advance notice of the nature of upcoming program offerings, are almost always available.

Memorandum for the Federal Communications Commission as *Amicus Curiae* at 5–6.

The distinction that the FCC and plaintiffs urge is that cable TV is not an intruder but an invitee whose invitation can be carefully circumscribed.[9] *See Pacifica* at

---

9. The Cable Policy Act requires that all cable operators must offer to their customers "a de-

vice by which the subscriber can prohibit viewing of a particular cable service during periods

748–49, 98 S.Ct. at 3039–40. Because a subscriber must initiate the service, there is no uninvited intrusion into the privacy interest that the Court articulated in *Pacifica*. The individual who complained about Carlin's monologue never subscribed to radio programs. In addition, the complainant did not pay an additional fee to be able to listen to Carlin's monologue, as a subscriber to HBO, Showtime or the Movie Channel must. No lock box device even existed. In addition, it does not appear that a radio program guide provided any information in advance to warn potential listeners of the content of Carlin's monologue.

b. *The Interests of Children.*—Defendants argue alternatively that the state's interest in protecting children justifies regulation of indecency. In *Pacifica* the Court wrote that the "ease with which children may obtain access to broadcast material, coupled with the concerns recognized in *Ginsberg*, amply justify special treatment of indecent broadcasting." *Id.* at 750, 98 S.Ct. at 3041. In *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), the Court upheld a New York law that prohibited the sale of "harmful" indecent material, not legally obscene, to persons under 17 years of age. The concerns emphasized in *Ginsberg v. New York* consisted of two separate interests that justified a different constitutional standard for minors. First, the state has an interest in the well-being of its youth. Second, parents have an interest in exercising authority over their children.

(1) *The State's Interest in the Well-Being of its Youth.* In *Ginsberg* the governmental and parental interests listed above both gave support to the same conclusion that the law was valid. In contrast, defendants set parental and governmental interests at odds with each other. Defendants allege that "not all parents will exercise [the] necessary degree of control. Many parents may be indifferent to this material or ignorant of its harmful effect." Defendants' Amended Memorandum in Opposition to Plaintiffs' Joint Motion for Summary Judgment at 26 (filed Mar. 22, 1984). In so arguing, defendants make a fundamental departure from *Pacifica*. According to the defendants, since not all parents will do their job in limiting their children's access to indecent material, the state must step in.

In drafting the Decency Act, the legislature addressed the admirable goal of protecting children from deleterious material. In the intent statement of the Decency Act, the legislators wrote that "children have access to cable television and, in many cases, are unsupervised by parents." *Id.* at 2. Thus, the legislators sought to assist parents in their supervisory role.

The language of the statute provides that civil fines apply only to material that "is presented in a patently offensive way for the time, place, manner and context in which the material is presented." Utah Code Ann. § 76–10–1702(4) (Supp.1983). This language, defendants argue, indicates that the legislature intended to prohibit presentation of "indecent" material only during the daytime. Defendants claim that *Pacifica* allows the state to channel indecent material to the early morning hours (12:00 a.m. to 7:00 a.m.) because of the interests of children.

Although protecting children is a very desirable and legitimate goal, the Act itself does not mention children anywhere. It does not provide any systematic procedure for protecting children. Section –1702(4) provides no limiting principle consistent with applicable constitutional standards. Even assuming *arguendo* that *Pacifica* validates a prohibition limited to the daytime, the statutory language does not channel indecency to specific viewing hours. The legal infirmities of the statute are so great that this court could not so limit the statute even through purposive construction without engaging in improper judicial legislation. Thus, the scope of the language is so uncertain as to chill legitimate expression in a way that the overbreadth doctrine forbids.

selected by that subscriber." Policy Act § 624(d)(2)(A).

Even though the language in section -1702 is constitutionally insufficient, the Attorney General argues that he has promulgated rules which cure any defect. These rules provide for nonenforcement during the "adult viewing hours" (midnight to 7:00 a.m.). The statute does not provide for any such rulemaking authority. In addition, if a subsequent attorney general decides to rescind the guidelines, protected speech will be threatened. This analysis assumes, without deciding, that such guidelines would be sufficient to cure any constitutional infirmity.

Moreover, localities possess an independent right to enforce the Decency Act. *Id.* § 76–10–1704(2). In addition, the statute provides that this "act does not preclude the ... right of cities, counties, or other political subdivisions from further regulating the distribution of indecent material over any cable television system or pay-for-viewing television programming." *Id.* § 76–10–1707. The Attorney General can neither prevent local government from enforcing the law to its fullest extent nor avert local enactment of other similarly inhibitory laws.

A further fact that must be taken into account is that the Act does not consider the rights of consenting adults under *Miller* to view nonobscene material. In *Pacifica* Justice Powell's concurrence emphasized the importance of protecting the rights of adults while at the same time insulating children from indecency. Justice Powell feared that the *Pacifica* ruling might "have the effect of 'reduc(ing) the adult population ... to (hearing) only what is fit for children.' [citation omitted] This argument is not without force." *Pacifica,* 438 U.S. at 760, 98 S.Ct. at 3046. Justice Powell concluded that the holding of the Court "does not prevent respondent Pacifica Foundation from broadcasting the monologue during late evening hours when fewer children are likely to be in the audience." *Id.* at 760, 98 S.Ct. at 3046. Thus, *Pacifica* seems to preserve the right of adults to listen to Carlin's monologue on the radio. Utah's cable television law would prevent adults from exercising their rights in a manner consistent with the rationale of *Pacifica.*

(2) *The Parental Interest in Supervising Children.*—Restrictions in the Utah Act may well be inconsistent with the right of parental control articulated in *Pacifica* and *Ginsberg.* The enforcement of the Act could result in a ban of certain defined materials that may have serious literary, artistic, political or scientific value and that some parents want to show their children. Under Utah's law they could not do so, even though rulings of the Supreme Court allow parents to provide materials for their children that the children themselves cannot purchase: "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." *Ginsberg v. New York,* 390 U.S. at 630, 88 S.Ct. at 1275 (footnote omitted).

Thus, the distinctions between *Pacifica* and the present case are manifest. *Pacifica* does not authorize the regulation attempted by the Utah Legislature. At best *Pacifica* stands for the proposition that a federal regulatory agency can monitor consumer complaints directed at broadcasters who operate in the public domain. The differences between radio and cable make *Pacifica* easily distinguishable and contradict defendants' argument.

3. *The 11th Circuit Case of Cruz v. Ferre Supports This Court's Treatment of Pacifica*

While the court prepared this opinion, the 11th Circuit decided the case of *Cruz v. Ferre,* 755 F.2d 1415 (11th Cir.1985). *Ferre* adds further support to this court's conclusion that *Pacifica* does not control the resolution of the present case. In *Ferre* the 11th Circuit considered the constitutionality of a Miami, Florida ordinance that provided for suspension or termination of the licenses of operators who knowingly distribute indecent material on cable television. The *Ferre* court held that the ordinance was unconstitutionally overbroad because it was not limited to obscenity and

applied without regard to the time of day or the ability of parents to control their children's access to unsuitable cable programs. In reaching this result, the court explicitly distinguished *Pacifica*, using an analysis similar to this court's.

The *Ferre* court recognized, as this court has, that cable television "does not 'intrude' into the home," that parents can significantly control their children's access to cable and that the *Bolger* case largely limited *Pacifica* to its facts. *Cruz v. Ferre*, 755 F.2d 1415, 1420–22 (11th Cir. 1985). Although the enforcement procedure in *Ferre* was different from the Decency Act's,[10] the *Ferre* court relied on the same factors as this court in determining that *Pacifica* is not useful precedent.

### E. The Utah Law as a Time, Place and Manner Restriction

Defendants argue that the Act, limited by the attorney general's guidelines, operates as a legitimate time, place and manner restriction and can be upheld on that basis. The phrase "time, place, and manner" is a legal term of art. The Supreme Court has sustained such restrictions when they regulate without regard to content, serve a significant governmental interest, and leave open ample alternative channels for communication. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 515–17, 101

S.Ct. 2882, 2896–97, 69 L.Ed.2d 800 (1981).[11]

Although the Decency Act purports to regulate cable material according to "the time, place, and context in which the material is presented," the Act cannot qualify as valid time, place, or manner restriction. This is because the Utah law and the attorney general's guidelines regulate according to content. The statute regulates according to content because it provides that fines will only be imposed when the material distributed violates the specific standards set forth in section –1702. The Attorney General states that "I do not plan to enforce the Act *based on any program containing indecency* which begins after midnight or which ends by seven o'clock in the morning." Cable Television Programming Decency Act of 1983, Op.Att'y Gen. No. 83–001, p. 10 (October 17, 1983) (emphasis added). Thus, the Attorney General distinguishes between permissible and impermissible cable material by reference to its content. *See Metromedia*, 453 U.S. at 516, 101 S.Ct. at 2897. Therefore, the Act cannot be sustained as a valid time, place or manner restriction.

■ Moreover, constitutional time, place and manner restrictions cannot be so vague as to infringe upon protected speech. The Supreme Court has noted that first amendment freedoms "are delicate and vulnera-

---

**10.** The Miami enforcement procedure differed from the Decency Act's in two respects. First, violation of the ordinance could mean that an operator's license could be suspended for up to nine days or revoked. *Cruz v. Ferre*, 755 F.2d 1415, 1417 (11th Cir.1985). The Decency Act provides for fines but does not give power to revoke a license. In theory, under the Decency Act an operator could broadcast indecent material as long as he paid the fines, costs and attorney's fees. As a practical matter, this course of action would probably prove to be too costly to the Utah cable operator. Viewed in this way, the sanctions in the two laws are analogous in effect.

Second, the ordinance in *Ferre* provided that the Miami city manager was to be the prosecutor, fact-finder and judge. *Id.* at 1416–17. The *Ferre* court held this procedure to be a violation of due process. Under the Utah Act, the attorney general or local prosecutor brings the action against an offending operator. An independent fact-finder would determine whether the opera-

tor had violated the Act. *See* Utah Code Ann. § 76–10–1704.

**11.** The defendants cite *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), for the proposition that there are exceptions to the content neutrality requirement when juvenile audiences are involved. Defendants' Amended Memorandum in Opposition to Plaintiffs' Joint Motion for Summary Judgment at 37–39 (filed Mar. 22, 1984). This argument fails for two reasons. First, no Court majority adopted the proposition. The citation is to the dissenting opinion. *Young* at 85–86, 96 S.Ct. at 2459–2460. The concurring opinion says that the regulation challenged in that case is not a time, place or manner restriction at all. *Id.* at 82 n. 6, 96 S.Ct. at 2458 n. 6. Second, even if an exception for juvenile audiences existed, this opinion demonstrates that the scope of the Utah law extends far beyond the interests of children.

ble, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. [citations omitted] Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

The Decency Act does not regulate with such "narrow specificity." This is because in determining whether material is indecent under the Act, the fact-finder must consider "the time, place, manner, and context in which the material is presented." Utah Code Ann. § 76–10–1702 (Supp.1983). The Act does not indicate to the fact-finder how a particular time, place, manner, or context should be considered in determining whether or not specific material is indecent. The words "time, place, manner, and context" neither provide the fact-finder with sufficient guidance nor adequately limit the scope of the Act to cure the constitutional infirmities discussed above. In so doing, the Act leaves prosecutors, judges and juries free "to pursue their personal predilections,"[12] because the limiting principles contained in *Miller* are not present in the Act.

Because the meaning of the words "time, place, manner, and context" is unclear, section –1702 does not provide the cable operators with notice of what material can or cannot be shown. Thus, operators may be deterred from distributing protected material because they are uncertain whether the showing of such material will subject them to the Act's sanctions. The Constitution requires "fair notice or warning," and legislatures must set reasonably clear guidelines for triers of fact. *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974). This statute provides neither fair notice or warning nor reasonably clear guidelines and is therefore void for vagueness.

## III. CONCLUSION

Cable television is a powerful form of communication. Used properly, it can edify and inspire as well as entertain. Used improperly, it can seriously damage the quality of life that we have and reduce public tastes to their lowest common denominator. Following Supreme Court precedent, today's ruling delineates an area in which private individuals, particularly parents, must assume an important responsibility for maintaining a decent society. The first amendment puts "the decision as to what views shall be voiced largely into the hands of each of us, in the hope that the use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).

## IV. ORDER

Based on the foregoing analysis this court concludes that the Utah Cable Television Programming Decency Act is unconstitutionally overbroad and vague, and void on its face.

As a result of this ruling, the court also necessarily holds, by reason of its analysis in Part I, that the Cable Communications Policy Act pre-empts the Utah Cable Television Programming Decency Act.

IT IS THEREFORE ORDERED that the plaintiffs' motion for summary judgment is granted, and the defendants' motion for summary judgment is denied.

Plaintiffs are directed to prepare a judgment reflecting the court's ruling and permanently enjoining the defendants from enforcing the Cable Television Programming Decency Act.

---

**12.** *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974).