800 F.2d 989
 55 USLW 2175, 13 Media L. Rep. 1913
 Connie R. JONES; Lynn F. Jones; Caroline A. Snow; Ralph
McCleary; Kay Ulrich; Ed Ulrich; Wayne Williams, as
individuals and as representative of a class of persons
similarly situated; Community Television of Utah, Inc.;
Community Cable of Utah, Inc.; Utah Satellite, Inc.; and
Wasatch Community T.V., Inc., Plaintiffs-Appellees,
Home Box Office, Inc., Plaintiff-in-Intervention-Appellee,
v.
Honorable David L. WILKINSON, Attorney General of the State
of Utah, in his official capacity and as representative of a
class of all persons empowered to enforce the Cable
Television Programming Decency Act (S.B. 309), Defendant-Appellant,
Morality In Media, Inc., National Cable Television
Association, Inc., the Freedom of Expression
Foundation, Inc., Amici Curiae.
 No. 85-2157.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 8, 1986.
 
 Bryan L. McDougal, Salt Lake City, Utah, George H. Shapiro, of Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., and Patricia A. O'Rorke, of the American Civil Liberties Union, Salt Lake City, Utah (Donald B. Holbrook and LeGrand R. Curtis, Jr., of Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, James P. Mercurio and Gerald E. Oberst, Jr. of Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., and, of counsel, Faith Wender of Home Box Office, Inc., Los Angeles, Cal., with them on the brief), for plaintiffs-appellees.
 Lloyd C. Eldredge, Salt Lake City, Utah, filed a brief for amicus curiae Morality in Media, Inc.
 Brenda L. Fox and Seth A. Davidson, Washington, D.C., filed a brief, for amicus curiae National Cable Television Ass'n, Inc.
 David M. Hunsaker of Putbrese & Hunsaker, McLean, Virginia, and M. Joel Bolstein and Craig R. Smith of Freedom of Expression Foundation, Inc. filed a brief, for amicus curiae The Freedom of Expression Foundation, Inc.
 Charles A. Hobbs, Sp. Asst. Atty. Gen., for the State of Utah, Washington, D.C., and David L. Wilkinson, Atty. Gen. of the State of Utah, Salt Lake City, Utah (Robert N. Parrish, Asst. Atty. Gen., Theodore A. Shields, of Hobbs, Straus, Dean & Wilder, Washington, D.C., of counsel, with them on the briefs), for defendant-appellant.
 Before LOGAN and BALDOCK, Circuit Judges, and SAFFELS, District Judge.*
 PER CURIAM.
 
 
 1
 Several Utah cable television subscribers, as individuals and as representatives of a class of persons similarly situated, and several Utah cable television operators filed separate suits for declaratory and injunctive relief, challenging the validity, under federal law and the United States Constitution, of the Utah Cable Television Programming Decency Act, Utah Code Ann. Secs. 76-10-1701 to -1708 (1983) (the Act). The suits named Utah Attorney General David L. Wilkinson defendant in his individual and official capacities and as representative of the class of Utah officials empowered to enforce the Act. The cases were consolidated and Home Box Office, Inc., a national cable television company, was permitted to intervene as a plaintiff.
 
 
 2
 The Act treats the showing by cable television systems, or pay-for-viewing television programming, of "indecent material" as a nuisance, punishable by fines and money forfeitures. Under the Act, "indecent material" includes the visual or verbal depiction or description of human sexual or excretory organs or functions, including exposure of genitals, pubic area, buttocks, or the showing of any portion of the female breast below the top of the nipple. The depiction is prohibited if the "average person applying contemporary community standards for cable television ... would find [it] is presented in a patently offensive way for the time, place, manner and context...." Id. Sec. 76-10-1702(4)(d).[1]
 
 
 3
 On cross motions for summary judgment, the district court found for the plaintiffs. Community Television of Utah, Inc. v. Wilkinson, 611 F.Supp. 1099 (D.Utah 1985). In its opinion the court focused on the federal preemption question raised by Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), and by Congress' subsequent enactment of The Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2780 (codified at 47 U.S.C. Secs. 521-559). The district court found that federal law preempts state regulation of the content of cable television programming, except that under federal law cable operators may still be held liable by a state for violating "obscenity ... or other similar laws." Wilkinson, 611 F.Supp. at 1103-04 (quoting 47 U.S.C. Sec. 558). Finding that the Utah statute exceeded this limited power,[2] the district court held that the federal act preempted the Utah statute. Wilkinson, 611 F.Supp. at 1104, 1117. It also held that the Utah statute "is unconstitutionally overbroad and vague, and void on its face." Id. at 1117.
 
 
 4
 The district court has written a comprehensive opinion with which we agree, and to which we can add little of value. We affirm its judgment on the basis of the reasons stated in the opinion.
 
 
 5
 We must, however, discuss one issue: the cable television companies' entitlement to attorney's fees under 42 U.S.C. Sec. 1988. Defendant does not object to the district court's award of attorney's fees to the individual plaintiffs, but does challenge its award to the corporate plaintiffs. Defendant argues that 42 U.S.C. Sec. 1988 was designed only to provide an incentive and means to secure counsel for those who could not otherwise afford to litigate for vindication of their civil rights. He alleges that the plaintiff corporations here are "deep pocket" litigants, who can afford to pay their own attorneys. He relies broadly on Zarcone v. Perry, 581 F.2d 1039 (2d Cir.1978), cert. denied, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979). Zarcone stated that a trial judge considering a Sec. 1988 fee award should look to "whether a person in the plaintiff's position would have been deterred or inhibited from seeking to enforce civil rights without assurance that his attorneys' fees would be paid if he were successful." Id. at 1044.[3]
 
 
 6
 The Supreme Court has declared that the prevailing party in a civil rights case "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968); see also Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (reaffirming general rule). In Love v. Mayor of Cheyenne, 620 F.2d 235, 237 (10th Cir.1980), we did reserve the issue of whether a plaintiff's ability to pay is a special circumstance that can render a fee award unjust. But our en banc opinion in Cooper v. Singer, 719 F.2d 1496 (10th Cir.1983), answered that question. In Cooper we decided that the presence of a contingent fee contract would not limit the amount of a fee award in a civil rights case. Id. at 1507. En route to that holding, in addition to expressing disapproval of Zarcone, we specifically stated that Sec. 1988 has purposes other than encouraging lawyers to take on a case, such as "penalizing obstructive litigation by civil rights defendants and generally deterring civil rights violations." Id. at 1501. These other purposes of Sec. 1988 compel us to say that the ability of a party to bring a suit without a fee award is not a special circumstance rendering a fee award unjust. Accord Duncan v. Poythress, 777 F.2d 1508, 1511-14 (11th Cir.1985) (en banc) (lawyer-litigant in civil rights case, representing self and thus arguably not needing Sec. 1988 encouragement to bring suit, not a special circumstance, defeating fee award); Ackerley Communications, Inc. v. City of Salem, 752 F.2d 1394, 1397 (9th Cir.) (ability to pay for lawyer not a special circumstance), cert. denied, --- U.S. ----, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985); Milwe v. Cavuoto, 653 F.2d 80, 83 (2d Cir.1981) (ability to pay not a special circumstance); Ellwest Stereo Theater, Inc. v. Jackson, 653 F.2d 954, 956 (5th Cir.1981) (ability to pay not a special circumstance).
 
 
 7
 Defendant separately contends that his good faith belief in the constitutionality of his actions should shield him from liability for attorneys' fees. But a defendant's good faith belief in the legality or constitutionality of its action has been rejected as a special circumstance warranting denial of attorney's fees. J. & J. Anderson, Inc. v. Town of Erie, 767 F.2d 1469, 1474 (10th Cir.1985); Love v. Mayor of Cheyenne, 620 F.2d 235, 236 (10th Cir.1980); Espino v. Besteiro, 708 F.2d 1002, 1005 (5th Cir.1983); see Hutto v. Finney, 437 U.S. 678, 693, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978).
 
 
 8
 The standard the district court applied in awarding fees was thus correct. Its actual fee award involved no abuse of discretion.
 
 
 9
 We therefore affirm the district court's award of attorney's fees, as well as its judgment on the merits.
 
 
 10
 AFFIRMED.
 
 
 11
 BALDOCK, Circuit Judge, specially concurring.
 
 
 12
 The per curiam opinion affirms the judgment on the basis of the district court's opinion. Community Television of Utah, Inc. v. Wilkinson, 611 F.Supp. 1099 (D. Utah 1985). Although precedent compels me to agree that the Utah Cable Television Programming Decency Act (Cable Decency Act), Utah Code Ann. Secs. 76-10-1701 to 76-10-1708 (1986 Supp.) is both vague and overbroad, I respectfully find that the Cable Decency Act does not withstand constitutional challenge on somewhat different and narrower grounds than the district court. I write separately because I do not agree with this court's apparent conclusion that federal law preempts state regulation of sexually oriented content which is not obscene. Per Curiam Opinion at 991 and n. 2. Nor do I agree that the first amendment forecloses the regulation of indecency[1] on cable television, provided that the regulation is a time, place and manner restriction that is narrowly drawn and exists for the protection of minors.I. Preemption
 
 
 13
 The Utah Cable Decency Act is preempted partially by the Federal Cable Communications Policy Act of 1984, 98 Stat. 2779-2806, insofar as it applies to indecent programming on commercial (leased access) channels or public, educational or governmental (P.E.G.) channels. Cable operators[2] generally are required to set aside certain channels for commercial use by persons unaffiliated with the operator and also for public, educational or governmental use. See 47 U.S.C. Secs. 531, 532. The cable operator is without editorial control over these channels. 47 U.S.C. Secs. 531(e), 532(c)(2). But the Utah Cable Decency Act could be used to impose civil liability on cable operators for indecent programming on leased access or P.E.G. channels, notwithstanding that cable operators are without editorial control over programming appearing on these channels. This is because under the Utah Act a cable operator could be considered to have "distributed" indecent material, thereby creating a nuisance, even though the operator was without editorial control over the indecent material.[3] The federal act expressly provides that cable operators shall not be held liable for the content of programs on leased access or P.E.G. channels. 47 U.S.C. Sec. 558. In those instances where a state provision conflicts with a federal statute, the federal statute prevails. U.S. Const. art. VI, cl. 2; Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 236, 67 S.Ct. 1146, 1155, 91 L.Ed. 1447 (1947); see also H. Hart & H. Wechsler, The Federal Courts and the Federal System 435 (1953).
 
 
 14
 The cable operator is without specific editorial control of leased access channels so as to insure that cable systems will provide diverse programming. 47 U.S.C. Secs. 521(4), 532(c)(2); H.R.Rep. No. 934, 98th Cong., 2d Sess. 47-52, reprinted in, 1984 U.S. Code Cong. & Ad. News 4684-4689. The franchising authority,[4] however, may regulate program content insofar as such content is not protected by the Constitution. 47 U.S.C. Sec. 532(h). Likewise, the cable operator is without editorial control of those cable channels designated for public, educational or governmental use, although a franchising authority and a cable operator may agree that certain cable services unprotected by the Constitution shall not be provided or shall be provided subject to conditions. 47 U.S.C. Sec. 544(d)(1).
 
 
 15
 Cable operators retain editorial control over their remaining channels, so it is necessary to consider whether the Utah Cable Decency Act might apply to plaintiff cable operators based on programming carried on those channels. 47 U.S.C. Sec. 558 provides:
 
 Criminal and civil liability
 
 16
 Nothing in this subchapter [V-A] shall be deemed to affect the criminal or civil liability of cable programmers or cable operators pursuant to the Federal, State, or local law of libel, slander, obscenity, incitement, invasions of privacy, false or misleading advertising, or other similar laws, except that cable operators shall not incur any such liability for any program carried on any channel designated for public, educational, governmental use or on any other channel obtained under section 532 of this title or under similar arrangements. (Emphasis added.)
 
 
 17
 Section 558 preserves state and local power to regulate certain types of expression on regular cable channels. Determining whether the phrase "other similar laws" includes laws pertaining to indecency requires review of the legislative history of the provision. In re George Rodman, Inc., 792 F.2d 125, 128 n. 8 (10th Cir.1986) (appropriate to consider legislative history when the purpose, intent or object of the statute is unclear from the language used therein).
 
 
 18
 The House Committee Report indicates that laws regulating indecency would not be preempted should those laws conform to constitutional requirements.
 
 
 19
 Section provides that nothing in this title shall be deemed to affect the criminal or civil liability of cable programmers or cable operators with respect to Federal (including FCC regulations), state and local laws not inconsistent with this title relating to libel, slander, obscenity, incitement, false or misleading advertising or other similar areas of the law.
 
 
 20
 ...
 
 
 21
 The Committee does not intend to affect liability which might result from other speech which may be held by the courts to be unentitled to constitutional protection (as discussed in relation to section [544(d) ].
 
 
 22
 H.R.Rep. No. 934, 98th Cong. 2d Sess. 95, reprinted in, 1984 U.S. Code Cong. & Ad. News, at 4732. The Committee discussion pertaining to Sec. 544(d)[5] indicates that Congress was well aware of the uncertainty surrounding the regulation of indecency on cable television in the absence of a Supreme Court ruling on the constitutionality of such regulation.
 
 
 23
 Subsection (d) addresses the issues of regulation of obscene programming services. The Committee is extremely concerned with the dissemination of programming containing explicit sexual material which might be offensive to many cable subscribers. The Committee is particularly concerned about the availability of such programming to child viewers. The Committee is also very mindful of the constraints the First Amendment imposes in terms of the permissibility of governmental regulation of program content.
 
 
 24
 ...
 
 
 25
 The provision covers not only obscene speech, but other speech which may also be unprotected by the Constitution of the United States (such as "fighting words" and speech which presents a "clear and present danger" to public order). This provision would also permit changing constitutional interpretations to be incorporated into the standard set forth in (d) (1) should those judicial interpretations at some point in the future deem additional standards, such as indecency, constitutionally valid as applied to cable.
 
 
 26
 H.R.Rep. No. 934, 98th Cong. 2d Sess. 69, reprinted in, 1984 U.S. Code Cong. & Ad. News 4655, 4706. The Committee was aware that indecency had been regulated in the context of mid-afternoon over-the-air broadcasting in F.C.C. v. Pacifica, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), but that three lower federal court decisions had determined that an indecency standard could not be applied constitutionally to cable television, Community Television of Utah, Inc. v. Roy City, 555 F.Supp. 1164 (D. Utah 1982); Home Box Office Inc. v. Wilkinson, 531 F.Supp. 987 (D. Utah 1982); Cruz v. Ferre, 571 F.Supp. 125 (S.D.Fla.1983), aff'd, 755 F.2d 1415 (11th Cir.1985). H.R.Rep. No. 98-934 at 70, reprinted in, 1984 U.S. Code Cong. & Ad. News at 4707.
 
 
 27
 The House Committee perceived a problem with the availability of obscene or indecent programming and discussed one alternative to restrict its availability to children.
 
 
 28
 The Committee recognizes with respect to cable the need to provide for the restriction, within constitutionally permissible grounds, on the availability of programming, which might not be obscene, but is nonetheless indecent, if children are going to be adequately protected from exposure to such material. Thus, [544)(d)(2)(A) provides one method for dealing with obscene or indecent programming by requiring every cable operator to provide to any subscriber upon request a device (often referred to as a "lock box") which is capable of restricting the viewing, during any period selected by the subscriber, of a cable service which contains obscene or indecent behavior.
 
 
 29
 Id. The Committee was of the view that "lock boxes" were one way to restrict the availability of obscene or indecent programming without affecting the first amendment rights of cable operators, programmers and viewers. There was no suggestion, however, that "lock boxes" were intended to be the only method for dealing with either obscenity or indecency.
 
 
 30
 Thus, the Utah Cable Decency Act insofar as it could apply to cable operators based on indecent programming on leased access or P.E.G. channels is preempted by federal law. This does not preclude the franchising authority, however, from exercising some control over constitutionally unprotected indecent programming on these channels. Whether the Utah Cable Decency Act may be used to regulate indecency in other situations (i.e. cable operators on regular channels and cable programmers on all channels) depends upon whether the Act is consistent with the first amendment. If the Utah Act violates the first amendment it is also preempted because Sec. 558 only allows the states and localities to regulate speech which is unprotected by the Constitution.
 
 II. First Amendment Considerations
 
 31
 It is now well settled that obscenity is not protected by the first amendment. Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957). Material is obscene if the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest and depicts or describes, in a patently offensive way, specified sexual conduct and lacks serious literary, artistic, political or scientific value. Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). That portion of the Utah Criminal Code pertaining generally to the distribution of pornographic material, i.e. Utah Code Ann. Secs. 76-10-1201(11), 76-10-1203(1) & 76-10-1204 (1978 Rep. Vol.), encompasses that which is obscene under the Miller test. Although a more specific Utah statute purporting to regulate distribution of pornographic and indecent material on cable television, Utah Code Ann. Sec. 76-10-1229 (1986 Supp.) was found unconstitutional in Home Box Office, Inc. v. Wilkinson, 531 F.Supp. 987 (D. Utah 1982), it appears that obscenity on cable television is within the purview of Utah's general statute criminalizing the distribution of pornographic material.
 
 
 32
 A fundamental issue raised by this appeal is whether sexually oriented material which is indecent is entitled to unlimited constitutional protection merely because it is not obscene. The district court resolved this question by holding that the Miller obscenity test is the outer limit of content-based regulation of sexually oriented material on cable television. 611 F.Supp. 1107-1109. To be sure, the Supreme Court has recognized that the portrayal of sex is not sufficient reason to deny material first amendment protection. Roth v. United States, 354 U.S. at 487, 77 S.Ct. at 1310. But the degree of protection may differ. Young v. American Mini Theaters, Inc., 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (plurality opinion) ("[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate...."). Both the content and context of speech must be considered in deciding the extent of first amendment protection. F.C.C. v. Pacifica, 438 U.S. at 744, 98 S.Ct. at 3037. But reasonable time, place and manner restrictions on sexually oriented material have been upheld in several cases, suggesting that regulation of indecent material for the protection of minors is not automatically barred by the first amendment.
 
 
 33
 In City of Renton v. Playtime Theatres, Inc., --- U.S. ----, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court upheld a city ordinance which prohibited adult theaters from locating within 1,000 feet of any residential zone, single or multiple-family dwelling, church, park or school. Although regulation based on content presumptively violates the first amendment, the ordinance was characterized as an allowable time, place and manner regulation which was content neutral because it was aimed not at the content of the films shown at such theaters, but rather at the secondary effects of such theaters on the surrounding community. Renton, 106 S.Ct. at 928-29. The city could look to evidence from other communities concerning the "adverse effects of the presence of adult motion picture theaters on neighborhood children and community improvement efforts," Northend Cinema, Inc. v. City of Seattle, 90 Wash.2d 709, 585 P.2d 1153, 1156 (1978), cert. denied, 441 U.S. 946, 99 S.Ct. 2166, 60 L.Ed.2d 1048 (1979), and enact the ordinance to further the substantial governmental interest of preserving the quality of urban life. Renton, 106 S.Ct. at 930-31. The ordinance also met the other requirement of a valid time, place and manner restraint: that there be reasonable alternative avenues of communication. Five percent of the land area of the city could be used for adult theaters and even though such land might not be commercially attractive, the ordinance did not have "the effect of suppressing, or greatly restricting access to, lawful speech." Renton, 106 S.Ct. at 932 (quoting Young v. American Mini Theatres, Inc., 427 U.S. at 71 n. 35, 96 S.Ct. at 2453 n. 35 (plurality opinion)).
 
 
 34
 In New York v. Ferber, 458 U.S. 747, 764, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982), the Court upheld a New York statute prohibiting a person from knowingly promoting a sexual performance by a child under 16 by distributing material which depicts such performances. Significantly, the Court determined that the first amendment test for the regulation of child pornography differed from the obscenity standard in Miller; the work need not be considered as a whole, need not appeal to the prurient interest of the average person, and need not be portrayed in a patently offensive manner. 458 U.S. at 764, 102 S.Ct. at 3358. The states are entitled to greater leeway in regulating child pornography for a number of reasons, one of which is that the Miller test for obscenity, with its requirements that the work be taken as a whole, that the sexual depiction appeal to the prurient interest and that the depiction be patently offensive, simply is ineffective in reducing the sexual exploitation and abuse of children which is "a government objective of surpassing importance." 458 U.S. at 757, 761, 102 S.Ct. at 3354, 3356.
 
 
 35
 The district court correctly pointed out that the Cable Decency Act does not conform to the Miller obscenity test because there is no requirement that a work taken as a whole appeal to the prurient interest and lack serious literary, artistic, political or scientific value. 611 F.Supp. at 1108. It also determined that the Miller requirement that the work depict or describe sexual conduct in a patently offensive way is missing in the Cable Decency Act. Id. Section 76-10-1702(4) defines indecent material with reference to the following depictions or descriptions: (a) a human sexual or excretory organ or function, (b) a state of undress (nudity), (c) an ultimate sexual act, or (d) masturbation. There is also a requirement that such depictions or descriptions be patently offensive. Utah Code Ann. Sec. 76-10-1702(4). I cannot agree that this list fails to satisfy the "patently offensive sexual conduct" element of the Miller test. In discussing this element, the Court declined to propose regulatory schemes for the States, but did give a few examples:
 
 
 36
 (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
 
 
 37
 (b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.
 
 
 38
 Sex and nudity may not be exploited without limit by films or pictures exhibited or sold in places of public accomodation any more than live sex and nudity can be exhibited or sold without limit in such public places (Footnote omitted.)
 
 
 39
 Miller v. California, 413 U.S. at 25, 93 S.Ct. at 2615. When the Utah statute is considered in light of the above, I think it does cover "patently offensive sexual conduct," which can include nudity. In any event, amicus Morality in Media suggests that the Miller test is inadequate to regulate sexually oriented material on cable television because of its requirement that the work be taken as a whole and that the work appeal to the prurient interest. When one considers the nature of television and the number of minors in the audience, it is apparent that there is highly objectionable sexually oriented material presented on cable television during family viewing hours notwithstanding that such material might not appeal to a minor's prurient interest (or could not because of young age) and might not be obscene when taken as a whole. See Record vol. III at 451.
 
 
 40
 The Court also has approved prohibiting a minor's access to sexually oriented magazines, even though those magazines were not obscene as to adults but were as to minors. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). This has become known as the concept of variable obscenity. Minors have a more restricted right than adults to sexually oriented material. It is permissible to determine what minors may view with reference to prevailing standards in the adult community with respect to what is suitable for minors. Ginsberg, 390 U.S. at 635, 88 S.Ct. at 1278. Implicit in a test relying on adult perceptions to determine whether material is suitable for minors is the recognition that most sexually oriented material is aimed primarily at sexually mature adults. Ginsberg, 390 U.S. at 635 n. 4, 88 S.Ct. at 1278 n. 4. Many states, including Utah[6], have enacted statutes which proscribe the distribution of material which is obscene as to minors.
 
 
 41
 Recently, two circuits have upheld ordinances which restrict not only the distribution to minors of sexually oriented material which is obscene as to them, but also the display of such material. The restricted material is not necessarily obscene as to adults, yet the restrictions were upheld. In M.S. News Co. v. Casado, 721 F.2d 1281 (10th Cir.1983), we viewed such restrictions as time, place and manner regulations. The ordinance at issue allowed the display of sexually oriented material harmful to minors in display racks which concealed the lower two-thirds of the material from view. The court rejected the argument that the ordinance was overbroad because it restricted the access of adults and older minors to constitutionally protected publications:
 
 
 42
 It is true that compliance with the ordinance will to some degree restrict the viewing by adults of materials which are, as to adults, constitutionally protected. However, the restriction is reasonable and does not offend the First Amendment.
 
 
 43
 721 F.2d at 1288. Although the ordinance was a content-based regulation, it did not suppress or greatly restrict access to protected speech and was "justified by the substantial governmental interest in protecting minors from exposure to harmful material." Id.
 
 
 44
 Similarly, the Eighth Circuit has considered an ordinance prohibiting the display of sexually oriented material harmful to minors unless the material is in a sealed wrapper. Upper Midwest Booksellers Ass'n v. City of Minneapolis, 780 F.2d 1389 (8th Cir.1985). The challenged ordinance also required that any cover, which standing alone would be harmful to minors, must be blocked from view by an opaque cover if minors would be able to view it otherwise. Appellants argued that the sexually oriented material had to be considered as a whole and that the ordinance was overbroad because that part regulating only the covers did not consider the material as a whole. The court of appeals rejected this argument and concluded that "the 'taken as a whole' requirement has no application outside the context of an attempt totally to suppress obscene material or criminally to prosecute someone for the dissemination of that material." 780 F.2d at 1393. Because adults still may review and purchase the material, the "taken as a whole" requirement was not applicable to the display regulations.
 
 
 45
 The Eighth Circuit held that the ordinance was a reasonable time, place and manner regulation because it furthered significant governmental interests and allowed for reasonable alternative methods of communication. The ordinance sought to promote the well-being of youth and support parental authority within the household but did not prohibit adults from viewing and purchasing sexually oriented material. The court stated:
 
 
 46
 Any burden here is the result of the permissible regulation of material that is obscene as to minors. The restriction in relation to adults is merely an incidental effect of the permissible regulation and is minimal in its impact. Adults are still free to request a copy of restricted material to view from a merchant or to peruse the material in adults only bookstores or in segregated sections of ordinary retail establishments. More significantly, adults are still able to view any of the material in a free and unfettered fashion by purchasing it. The continued availability of these materials to adults for purchase under the ordinance weighs strongly in favor of the ordinance's constitutionality.
 
 
 47
 780 F.2d at 1395. The Fourth Circuit in American Booksellers Ass'n, Inc. v. Virginia, 792 F.2d 1261, 1266 (4th Cir.1986), appears to have reached the opposite conclusion in determining that alternate display methods for sexually oriented material would be ineffective or unduly burdensome on first amendment rights.
 
 
 48
 Thus, there is authority to suggest that the Miller adult obscenity standard is not the exclusive test to be applied to the regulation of sexually oriented material. Whether non-obscene sexually oriented material can be regulated in the cable television context depends in large part upon how cable television is characterized as a medium of expression. The Court has stressed that each medium of expression is unique insofar as first amendment analysis is concerned. Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800 (1981); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 502-03, 72 S.Ct. 777, 780-81, 96 L.Ed. 1098 (1952).
 
 
 49
 For several reasons, traditional broadcasting has received the most limited first amendment protection. F.C.C. v. Pacifica, 438 U.S. at 748, 98 S.Ct. at 3039. One reason for this is the physical scarcity of broadcast frequencies; government allocation and regulation of broadcast frequencies is necessary to serve the public interest. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 375-76, 396-400, 89 S.Ct. 1794, 1798-99, 1809-12, 23 L.Ed.2d 371 (1969). In the past, a broadcast license has been described as a public trust because the broadcaster has been granted exclusive use of a frequency in the public domain. Office of Communication of United Church of Christ v. F.C.C., 359 F.2d 994, 1003 (D.C. Cir.1966).
 
 
 50
 In Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, 412 U.S. 94, 110, 93 S.Ct. 2080, 2090, 36 L.Ed.2d 772 (1973), the Court described the congressional approach to regulation of private broadcasters under the Communications Act of 1934:
 
 
 51
 From these provisions it seems clear that Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations. Only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters will government power be asserted within the framework of the Act.
 
 
 52
 Traditional broadcasting has involved a balancing of the first amendment rights of private broadcasters with what is determined to constitute the public interest. Thus, in Red Lion Broadcasting, 395 U.S. at 377, 89 S.Ct. at 1799, the Court upheld the fairness doctrine which requires that a broadcaster give adequate and fair coverage to public issues, including opposing views. One who has been personally attacked on a broadcast must be offered a personal opportunity to respond, just as a candidate who has not been endorsed must be given reply time. Id. On the other hand, broadcasters are not required by the public interest standard or the first amendment to accept paid editorials. Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). Although the first amendment rights of the broadcasters are important, the rights of the viewers and listeners are paramount. C.B.S., Inc. v. F.C.C., 453 U.S. 367, 395, 101 S.Ct. 2813, 2829, 69 L.Ed.2d 706 (1981).
 
 
 53
 Another reason advanced for the greater first amendment leeway in regulating broadcasting concerns the pervasiveness of this form of communication. In F.C.C. v. Pacifica, 438 U.S. at 748-49, 749 n. 27, 98 S.Ct. at 3039-40, 3040 n. 27, Justice Stevens determined that the intrusive nature of broadcasting and its location in the home allows for greater regulation of patently offensive, indecent material than was allowable in Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), where the appellant, in the hall of a public courthouse, wore a jacket with an offensively stated political message on the back. In his concurring opinion in Pacifica, Justice Powell also recognized "the interest of unwilling adults in not being assaulted by such offensive speech in their homes." 438 U.S. at 762, 98 S.Ct. at 3047. In public places, the offended viewer or listener may well need to turn away, but in the sanctuary of the home he may have more control. F.C.C. v. Pacifica, 438 U.S. at 749 n. 27, 98 S.Ct. at 3040 n. 27; Rowan v. United States Post Office Dep't, 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970).
 
 
 54
 Another reason that broadcasting has been subject to greater regulation consistent with the first amendment is its wide availability and accessibility to children. F.C.C. v. Pacifica, 438 U.S. at 749-50, 762, 98 S.Ct. at 3040-41, 3047. Thus, there is no unqualified right to broadcast obscene or indecent material. 18 U.S.C. Sec. 1464. In the case of indecent material, so long as such material remains available to adults, perhaps at a different time or in another medium, the state may restrict the times when such material is broadcast. F.C.C. v. Pacifica, 438 U.S. 726, 750 n. 28 (plurality opinion) & 760, 98 S.Ct. 3026, 3040 n. 28, 3046, 57 L.Ed.2d 1073 (Powell, J. concurring). The rationale behind such a restriction is not to defeat the rights of minors, but to protect them from their own improvidence and the acts of others. See Ginsberg v. New York, 390 U.S. at 649-50, 88 S.Ct. at 1285-86 (Stewart J., concurring in result)(first amendment presupposes full capacity for individual choice not yet attained by minors). Such a restriction also enhances a parent's right to minimize a child's exposure to such material, while still retaining the benefits of broadcasting.
 
 
 55
 The degree of first amendment protection that will be accorded cable television has yet to be determined by the Supreme Court. City of Los Angeles v. Preferred Communications, Inc., --- U.S. ----, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986), involved a first amendment challenge to the city's exclusive cable franchising process by auction. The respondent alleged that there was sufficient excess physical capacity to handle additional channels as well as the economic demand for an additional cable system. The Ninth Circuit reversed the district court's dismissal of the first amendment claim, holding that the city could not limit access to a single cable television company by use of an auction process when there was sufficient excess physical and economic capacity to handle another system. Preferred Communications, Inc. v. City of Los Angeles, 754 F.2d 1396 (9th Cir.1985). The court of appeals determined that for first amendment purposes cable television was unlike broadcasting, see e.g. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 25 L.Ed.2d 371 (1969), because there was a lack of physical scarcity of cable channels. 754 F.2d at 1403-04. It also rejected an economic scarcity rationale to justify increased regulation by government relying on Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The Supreme Court affirmed the court of appeals, but on narrower grounds. The Court declined to accept the appellate court's detailed characterization of cable television and its relationship to the first amendment in the absence of greater factual development at the trial court. City of Los Angeles v. Preferred Communications, Inc., 106 S.Ct. at 2036. The Court, however, did make some general observations. Cable television operators plainly engage in first amendment activities not only by producing original programming, but also by exercising editorial discretion over programming. Id. at 2037. Just as broadcasters are entitled to first amendment protection, so too are cable operators. Id.
 
 
 56
 Of course, the conclusion that respondent's factual allegations implicate protected speech does not end the inquiry. "Even protected speech is not equally permissible in all places and at all times." Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. ----, ----, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Moreover, where speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests. See, e.g., Members of the City Council v. Taxpayers for Vincent, supra, 466 U.S. , at 805-807, 104 S.Ct. [2118], 2129-2130 [80 L.Ed.2d 772 (1984) ]; United States v. O'Brien, 391 U.S. 367, 376-377 [88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672] (1968).
 
 
 57
 City of Los Angeles v. Preferred Communications, Inc., 106 S.Ct. at 2037-38. Justice Blackmun's concurring opinion leaves little doubt about the importance of an adequate factual basis for deciding the extent of first amendment protection associated with cable access.
 
 
 58
 In assessing First Amendment claims concerning cable access, the Court must determine whether the characteristics of cable television make it sufficiently analagous to another medium to warrant application of an already existing standard or whether those characteristics require a new analysis. As this case arises out of a motion to dismiss, we lack factual information about the nature of cable television. Recognizing these considerations, ante, at ---- [106 S.Ct. at 2037], the Court does not attempt to choose or justify any particular standard.
 
 
 59
 Id. at 2038 (Blackmun, J. concurring). Several federal courts have considered the issue, discussed below, with differing results.
 
 
 60
 In Community Communications Co., Inc. v. City of Boulder, 660 F.2d 1370 (10th Cir.1981), cert. dismissed, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982), we concluded that cable broadcasting is very different from newspaper publishing where very little government regulation is constitutionally permissible. We declined to apply Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). In Tornillo, the Court declared unconstitutional a Florida statute requiring a newspaper to publish a candidate's reply to newspaper criticism and rejected an economic scarcity argument to justify such government regulation of the press. Cable television is distinguishable from a newspaper in that it is extensively regulated and is a natural economic monopoly which depends heavily upon use of the public domain. Community Communications, 660 F.2d at 1379. Thus, "government must have some authority in such a context to see to it that optimum use is made of the cable medium in the public interest." Id. The degree of authority depends upon the extent to which the cable operation is a natural monopoly, technological development and change, and finally, the uses and possible uses of the medium. Id. Other courts have determined that cable television may be subjected to more regulation than non-broadcast media. Omega Satellite Products v. City of Indianapolis, 694 F.2d 119, 127-28 (7th Cir.1982); Berkshire Cablevision of Rhode Island, Inc. v. Burke, 571 F.Supp. 976, 983-87 (D.R.I. 1983); Hopkinsville Cable TV, Inc. v. Pennroyal Cablevision, Inc. 562 F.Supp. 543, 547 (W.D.Ky.1982).
 
 
 61
 Regulations involving the first amendment interests of cable operators and viewers are difficult to justify on a physical scarcity rationale given the tremendous channel capacity of a cable system. Home Box Office, Inc. v. F.C.C., 567 F.2d 9, 44-46 (D.C. Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Moreover, at least three courts of appeals appear to have rejected the economic scarcity rationale as a justification for more extensive governmental regulation of cable television. Id. at 46; Preferred Communications v. City of Los Angeles, 754 F.2d 1396, 1405 (9th Cir.1985), aff'd on other grounds, --- U.S. ----, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986); see also Midwest Video Corp. v. F.C.C., 571 F.2d 1025, 1055-56 (8th Cir.1978), aff'd on other grounds, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979).
 
 
 62
 The district court resolved the present case on cross motions for summary judgment. It relied on few facts because the statute was challenged as overbroad on its face. 611 F.Supp. at 1107. The district court considered the following undisputed facts concerning the nature of cable television service in Utah. I set these out because I think that facts pertaining to the nature of cable television are essential in deciding the degree of permissible content-based regulation.
 
 
 63
 9. A cable television system is a non-broadcast facility consisting of a system of privately-owned coaxial cables and associated signal generation, reception and control equipment that distributes television and other programming to subscribers.
 
 
 64
 10. Cable television service, such as that provided by [the cable operator plaintiffs], is legally available only on the premises of persons who choose to subscribe to this service and agree to establish and maintain a physical connection between their television receivers and a cable television system.
 
 
 65
 11. Television receivers that are not physically connected to a cable television system are not capable of receiving programming that is distributed solely over such a system.
 
 
 66
 12. The primary cable service offered to subscribers of [the cable operator plaintiffs] is called basic cable service. The basic cable service subscription price may include, depending on the particular system, retransmissions of the local television broadcast channels ..., plus additional television broadcast channels imported by satellite to terrestrial transmissions from distant cities (KWGN-Denver, KTVU-Oakland, KTXL-Sacramento, WTBS-Atlanta, WGN-Chicago, and WOR-New York), plus special just-for-cable channels (ESPN, USA, CNN, SNC, MTV, NN, CBN, CHN, C-Span, and University of Utah ITV).
 
 
 67
 13. In addition to their basic cable service, [the cable operator plaintiffs] offer to provide programming such as that distributed by HBO (which includes recently released, feature length motion picture films, special entertainment programming and sports events) to those subscribers who choose to subscribe to this programming and to pay a monthly subscription fee in addition to the monthly fee paid for basic cable service.
 
 
 68
 14. HBO Service and pay television program services offered by companies other than HBO, including such services as Showtime, the Movie Channel and the Disney Channel, are provided by [the cable operator plaintiffs] and other cable system operators.
 
 
 69
 15. Each pay television program service offered by [the cable operator plaintiffs] and other cable system operators is offered over a separate channel, and cable subscribers may choose to receive any or all of these program services.
 
 
 70
 16. [The cable operator plaintiffs] presently have about 60,000 subscribers in Utah.
 
 
 71
 17. Cable subscribers may obtain, either at no cost or at a cost not to exceed $20.00, a "lockbox" which is key operated and attaches to the television set. These lockboxes enable subscribers to render their sets incapable of receiving any particular channel. Such devices, while available, are not widely utilized by subscribers.
 
 
 72
 Record vol. III at 384-86. Although this provides some information on the nature of cable television, the defendants suggested other relevant characteristics. However, the district court correctly determined that such information was not presented in accordance with Fed.R.Civ.P. 56 which requires that material supporting a motion for summary judgment be admissible evidence. 611 F.Supp. at 1107.
 
 
 73
 The defendants attempted to establish the following: (1) out of 84 million television households, 34 million now subscribe to cable with recent annual growth of 5 million households per year, (2) the cable systems operated by the plaintiffs are de facto monopolies because after each cable operator was granted its franchise, no second cable operator sought a competing cable franchise[7], (3) that the cable operator plaintiffs use or cross public property in laying their cables and are subject to various local requirements, and (5) that less than one percent of the cable subscribers have purchased lockboxes. Record vol. III at 448-449 (paragraphs 25, 27 & 28). The plaintiffs objected to the relevance and materiality of all these contentions, although they did not object to the historical subscription information when considered as an approximation. Record vol. IV at 600-601. Plaintiffs also did not agree that cable systems are de facto monopolies. Id. at 601.
 
 
 74
 The district court also did not consider information concerning the scanning practices of cable viewers, programming control exercisable by cable operators and the extent that movies shown on cable are rated. Record vol. III at 449-450. Again, such information did not meet the requirements of Fed.R.Civ.P. 56. The legal determination about the first amendment status of cable television depends somewhat upon an evidentiary basis. But even though the characteristics of cable television were not developed with great specificity at the district court, it seems that the extent of permissible regulation turns on a comparison of the cable medium with other media, particularly broadcasting.
 
 
 75
 Indecent broadcasting has been regulated. 18 U.S.C. Sec. 1464. The extent of that regulation is better understood with reference to F.C.C. v. Pacifica, 438 U.S. 726, 98 S.Ct. 3026, which, despite criticism, see e.g., L. Tribe, American Constitutional Law 61-68 (1979 Supp.), remains the leading Supreme Court precedent on the subject. In Pacifica, the Supreme Court considered whether the F.C.C. could regulate an indecent broadcast consistent with the first amendment. The F.C.C. had issued a declaratory order in response to a complaint against a New York radio station based on the broadcast of a monologue by comedian George Carlin entitled "Filthy Words." The monologue was broadcast about 2:00 p.m. on a Tuesday afternoon. Before the recorded monologue was broadcast, the host of the program warned that it included sensitive language that might offend some listeners, advising them to change stations and return in 15 minutes. Pacifica Foundation, 56 F.C.C.2d at 95-96.
 
 
 76
 A man accompanied by his young son heard the broadcast while driving and complained to the F.C.C. In its Memorandum Opinion and Order, the F.C.C. acknowledged that it is precluded from censorship, 47 U.S.C. Sec. 326, but it and the Justice Department are required to enforce 18 U.S.C. Sec. 1464 which prohibits broadcasting of "any obscene, indecent, or profane language." Pacifica Foundation, 56 F.C.C.2d at 96 p 7. The F.C.C.'s declaratory order was not intended to interfere with the wide discretion of broadcasters in the programming area. Id. citing Pacifica Foundation, 36 F.C.C. 147 (1964)(provocative programming offensive to some listeners might be scheduled for late evening hours when number of children in audience minimized). The F.C.C. was of the view that indecency, as used in 18 U.S.C. Sec. 1464, was not subsumed by the concept of obscenity, a view which necessarily prevailed at the Supreme Court. Pacifica Foundation, 56 F.C.C.2d at 97 p 10; 438 U.S. at 744, 98 S.Ct. at 3037. Rather than totally restricting indecency, the F.C.C. analogized to nuisance law in suggesting that it could be channeled into appropriate time periods. Pacifica Foundation, 56 F.C.C.2d at 98 p 11. The F.C.C. was concerned with the constitutional implications of even a limited restriction:
 
 
 77
 In order to avoid the error of overbreadth, it is important to make it explicit whom we are protecting from what. As previously indicated, the most troublesome part of this problem has to do with the exposure of children to language which most parents regard as inappropriate for them to hear. This parental interest has "a high place in our society." See Wisconsin v. Yoder, 406 U.S. 205, 214 [92 S.Ct. 1526, 1532, 32 L.Ed.2d 15] (1972), and cases cited therein. Therefore, the concept of "indecent" is intimately connected with the exposure of children to language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of day when there is a reasonable risk that children may be in the audience. (Footnote omitted.). Obnoxious, gutter language describing these matters has the effect of debasing and brutalizing human beings by reducing them to their mere bodily functions, and we believe that such words are indecent within the meaning of the statute and have no place on radio when children are in the audience.
 
 
 78
 Id. Indecency differs from obscenity in that indecency need not appeal to the prurient interest and, when the number of children in the audience has not been reduced to a minimum, it is not protected by a claim that it has literary, artistic, political or scientific value. See id. The F.C.C. recognized that during the late evening hours, when the number of children in the audience was minimized, its definition of indecency would remain the same, though such material might be protected if it were shown to have serious literary, artistic, political or scientific value. Pacifica Foundation, 56 F.C.C.2d at 98 p 12.
 
 
 79
 Without question, the focus of the Supreme Court's review concerned the F.C.C.'s determination that the Carlin monologue was indecent as broadcast. F.C.C. v. Pacifica, 438 U.S. at 735, 98 S.Ct. at 3033. However, in reviewing that determination, it was essential for the Court to determine that the broadcast of indecent material could be restricted in appropriate circumstances consistent with the first amendment. See id. at 744, 745 n. 20 (plurality opinion) & 761, 98 S.Ct. at 3037, 3038 n. 20 & 3046 (Powell, J., concurring). This necessarily involved considering the degree of first amendment protection accorded material disseminated by broadcasting.
 
 
 80
 The F.C.C. gave four reasons for treating broadcasting differently for first amendment purposes than other types of expression which are less intrusive:
 
 
 81
 (1) children have access to radios and in many cases are unsupervised by parents; (2) radio receivers are in the home, a place where people's privacy interest is entitled to extra deference, see Rowan v. Post Office Dept., 397 U.S. 728 [90 S.Ct. 1484, 25 L.Ed.2d 736] (1970); (3) unconsenting adults may tune in a station without any warning that offensive language is being or will be broadcast; and (4) there is a scarcity of spectrum space, the use of which the government must therefore license in the public interest.
 
 
 82
 Pacifica Foundation, 56 F.C.C.2d at 97 p 11, quoted in, F.C.C. v. Pacifica, 438 U.S. at 731 n. 2, 98 S.Ct. at 3031 n. 2. The Court, in discussing why indecent broadcasting was subject to special treatment under the first amendment, emphasized the pervasive presence that the broadcast media have established in the lives of Americans and the unique accessibility of broadcasting to children. 438 U.S. 748-49, 98 S.Ct. at 3039-40. This rationale would seem equally applicable to cable television for several reasons, yet the district court declined to apply the Pacifica rationale based on what it perceived as the legal insignificance of the decision, 611 F.Supp. 1109-12, and the factual differences between broadcasting and cable, id. at 1113-15. In my view, Pacifica is relevant to the regulation of indecency on cable television, but the Utah Cable Decency Act is not a valid time, place and manner restraint on indecency even under Pacifica.
 
 
 83
 There are several reasons which support the notion that cable television is similar to broadcasting for regulation of programming content consistent with the first amendment. Even though cable television is transmitted by cable and regular television is transmitted by broadcasting, there is an undeniable similarity between the two. Both rely on television receivers and provide a similar, and often interchangeable, product. United States v. Southwestern Cable Co., 392 U.S. 157, 177, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968)(under Communications Act, F.C.C. had jurisdiction over cable television, an "important aspect of television service."); United States v. Midwest Video Corp., 406 U.S. 649, 665, 92 S.Ct. 1860, 1869, 32 L.Ed.2d 390 (1972). In F.C.C. v. Midwest Video Corp., 440 U.S. 689, 708-709, 99 S.Ct. 1435, 1445-46, 59 L.Ed.2d 692, the Court determined that, like broadcast systems, cable systems could not be regulated as common carriers. To permit the regulation of indecency in radio and television broadcasting, but not on cablecasting, based merely on the differences in transmission, is to deemphasize that the programming transmitted on both emanates from outside the home and is received identically.
 
 
 84
 Just as radio and television are pervasive, so too is cable television with over 34 million, or approximately 40 percent of, television households subscribing. Moreover, if past trends continue, the number of subscribers can be expected to increase. The pervasiveness of television simply is not related to how the signal reaches the set. Pervasiveness is related to the location of the television set in the home, the scanning activity of viewers, and other qualities of the television medium.
 
 
 85
 Much has been made of the fact that a television household must elect to have cable installed and then pay a monthly fee for its use.[8] This distinction between traditional broadcasting and cablecasting, more than any other, has lead many including the district court to conclude that cable television "is not an intruder but an invitee whose invitation can be carefully circumscribed." 611 F.Supp. at 1113. Merely because cable television is a subscriber medium does not mean that it is so unlike traditional broadcasting that indecency cannot be regulated. It is helpful to review those elements that distinguish traditional broadcasting from other media when determining whether cable television is pervasive. In WUHY-FM, the F.C.C. said:
 
 
 86
 And here it is crucial to bear in mind the difference between radio and other media. Unlike a book which requires the deliberate act of purchasing and reading (or a motion picture where admission to a public exhibition must be actively sought), broadcasting is disseminated generally to the public ... under circumstances where reception requires no activity of this nature. Thus, it comes directly into the home and frequently without any advance warning of its content. Millions daily turn the dial from station to station. While particular stations or programs are oriented to specific audiences, the fact is by its very nature, thousands of others not within the "intended" audience may also see or hear portions of the broadcast. (Footnote omitted.) Further, in that audience are very large numbers of children. (Footnote omitted.)
 
 
 87
 24 F.C.C.2d 408, 411 (1970). When further analyzed, it is apparent that merely subscribing to cable does not alter its basic nature. A subscription to cable presumably is purchased to enhance the viewers' choice of programs. It is easy to get a general idea of the contents of a book or magazine, but with television it may be more difficult because of the tremendous diversity of programming, the large number of programs and the scanning which occurs. This is particularly true when indecent programming is interspersed with programming generally thought suitable for minors.
 
 
 88
 Practically, cable television reception does not require activity of a purchasing nature for each program. The cable viewer is not purchasing a particular program at the time of viewing, rather he is purchasing a wider range of programs than available on broadcast television. He is purchasing program choice. Cable programs are then disseminated generally to the public, and like programs on conventional television or radio, are frequently viewed or heard in the home where the right to be free of "patently offensive indecent material" outweighs an unlimited right to present such material. F.C.C. v. Pacifica, 438 U.S. at 748, 98 S.Ct. at 3039.
 
 
 89
 Not only does cable television come directly into the home, it frequently is viewed without any effective advance warning of patently offensive, indecent material. This is true for several reasons. Out of the hundreds of programs offered on cable television, it is unreasonable to shift an affirmative duty onto every parent to study all cable television program listings each week, even assuming that such listings provide adequate warning. No such duty was even considered by the Court in Pacifica. While it is true that lockboxes may be used to prevent reception of entire channels, the unwanted complexity that these devices introduce into television viewing is attested to by their lack of use. Most importantly, there is no reason to believe that frequent scanning, often a factor in the regulation of broadcasting, does not occur with cablecasting. This means that viewing often will be unplanned and incomplete. Viewers will tune into scenes of programs in progress, reducing the effectiveness of warnings preceding such programs. See id.
 
 
 90
 Over and over the argument has been made that a subscriber voluntarily chooses cable television service and should not be heard to complain if some of the programming is indecent because the service may be canceled. Stated another way, the subscriber consents to the indecency for himself and his household. This argument is too simplistic and is akin to the notion that one who hears an indecent broadcast has an adequate remedy by turning it off. This notion was expressly rejected in F.C.C. v. Pacifica, 438 U.S. at 748-49, 98 S.Ct. at 3039-40. The record indicates that the basic cable service and the optional services provide plenty of programming without patently offensive indecent material. As a developing medium, cable television provides a remarkable opportunity for viewing programming in other distant cities, recent movies, sports and other features for a nominal fee. That opportunity should be available to all who are willing to subscribe, even those who object to patently offensive indecent material being presented during family viewing hours. Quite simply, in enacting the Cable Decency Act, the Utah legislature seems to have wanted to take the good (increased choice) without the bad (indecent material).
 
 
 91
 The intent statement of the Cable Decency Act indicates that the Utah legislature was concerned that children have access to cable television and their viewing is largely unsupervised. As discussed previously, the state may restrict access to sexually oriented material which is not obscene provided there is not an outright ban. This is to protect both the state's interest in the well-being of children, Prince v. Massachusetts, 321 U.S. 158, 166-67, 64 S.Ct. 438, 442-43, 88 L.Ed. 645 (1944), and the right of parents to direct the upbringing of their children, Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1978). Admittedly, some parents may have no objection to their children viewing what by contemporary community standards is patently offensive and indecent. That alone does not preclude the state from channeling the indecency to a later time period. It does not matter that some children still may have access to indecent programming when fewer children are in the audience, for an appropriate regulatory act may protect many households. Pacifica Foundation v. F.C.C., 556 F.2d at 34 (D.C. Cir.1977)(Leventhal, J., dissenting).
 
 
 92
 Thus, I find that the Pacifica rationale for the regulation of indecency applies to cablecasting. Contra Cruz v. Ferre, 755 F.2d 1415, 1420 (11th Cir.1985). Although it has been suggested that Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 74, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983), limits Pacifica, that interpretation is unpersuasive. In Bolger, the Court held that a federal statute totally banning the mailing of unsolicited advertisements for contraceptives was contrary to the first amendment. The government sought to justify the total prohibition based on the interests furthered by the statute: protecting recipients from offensive material and protecting the right of parents to guide their children concerning contraception. The Court determined that the former was entitled to little weight and that the latter was furthered too minimally to justify a total prohibition. Bolger, 463 U.S. at 73, 103 S.Ct. at 2883. The Court was satisfied that parents exercise substantial control over the distribution of mail received at home and that the restrictions on this type of mail allowed parents to control and eliminate its receipt. Id. at 64 n. 5 & 73, 103 S.Ct. at 2878 n. 5 & 2883.
 
 
 93
 The Court discussed Pacifica indicating it was a narrow holding which applied to broadcasting based on the unique pervasiveness of broadcasting and its unique accessibility to children. Id. at 74, 103 S.Ct. at 2884. Because I find that these same two characteristics are inherent in cablecasting, I cannot read Bolger as limiting Pacifica's application to this case. Moreover, Bolger is factually distinguishable. The receipt and distribution of printed advertising concerning contraceptives is easily and effectively controlled by parents. The reception of cable television is not.
 
 
 94
 It must be remembered, however, that Pacifica principally concerns the regulation of indecency as applied to a specific factual context. In Pacifica, Justice Stevens remarked that "indecency is largely a function of context--it cannot be adequately judged in the abstract." 438 U.S. at 742, 98 S.Ct. at 3037; see also id. at 750, 98 S.Ct. at 3040. Nonetheless, the case before the court involves a challenge to the Utah Cable Decency Act on its face. Invalidation of legislative enactments without the benefit of facts concerning application is "manifestly, strong medicine" which "has been employed by the Court sparingly and only as a last resort." Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). The purpose of such invalidation is to protect the exercise and potential exercise of constitutionally protected expression. "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Id. at 615, 93 S.Ct. at 2918. Stated another way, the statute must reach "a substantial number of impermissible applications." New York v. Ferber, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982).
 
 
 95
 Even if Pacifica is read to allow regulation of indecency on cable television, the Utah Cable Decency Act is not acceptable because it is complete prohibition rather than regulation. In other words, indecency may be regulated with an acceptable time, place and manner regulation. See Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Although the Utah legislature has identified a substantial governmental interest in the protection of minors, it has not provided for reasonable alternative times for the dissemination of indecent material. A thoughtful opinion by the Utah Attorney General makes a persuasive case that the legislature did not intend a total ban on indecency. The statute does not adequately reflect that intention, however, and a federal court cannot rewrite the statute. See Utah Op. Att'y Gen. No. 83-001.
 
 
 96
 The statute is also void for vagueness. Defining indecency with express reference to "the time, place, manner and context in which the material is presented," Utah Code Ann. Sec. 76-10-1702(4), without more, would cause people of common intelligence to guess at the meaning of indecency and differ as to the law's application. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This uncertain meaning does not provide fair notice of what is proscribed, could result in arbitrary enforcement and could deter protected expression. Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). For these reasons, I am compelled to agree with the result reached by the district court.
 
 
 
 *
 Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 The entire definition is as follows:
 "(4) 'Indecent material' means a visual or verbal depiction, display, representation, dissemination, or verbal description of:
 (a) A human sexual or excretory organ or function; or
 (b) A state of undress so as to expose the human male or female genitals, pubic area, or buttocks, with less than a fully opaque covering, or showing of the female breast with less than a fully opaque covering of any portion below the top of the nipple; or
 (c) An ultimate sexual act, normal or perverted, actual or simulated; or
 (d) Masturbation
 which the average person applying contemporary community standards for cable television or pay-for-viewing television programming would find is presented in a patently offensive way for the time, place, manner and context in which the material is presented."
 Utah Code Ann. Sec. 76-10-1702(4).
 
 
 [2]
 The statute would prohibit, for example, a "verbal description of ... male ... buttocks ... which the average person ... would find ... patently offensive." See supra, note 1. The State of Utah admits that it intends to regulate matters that go beyond outright "obscenity."
 
 
 [3]
 Zarcone specifically established a "bright prospects" rule, denying attorneys' fees when the likelihood of success was sufficient to attract competent counsel on a contingent fee basis. 581 F.2d at 1044; see also Buxton v. Patel, 595 F.2d 1182, 1184 (9th Cir.1979). In the instant case, in which declaratory and injunctive relief is sought, no contingent fee contract is feasible. The "bright prospects" rule is thus not relevant. Even if it were, this circuit previously has rejected the "bright prospects" rule. See Cooper v. Singer, 719 F.2d 1496, 1501 (10th Cir.1983) (en banc); J. & J. Anderson, Inc. v. Town of Erie, 767 F.2d 1469, 1473-74 (10th Cir.1985)
 The Second Circuit has narrowed the authority of Zarcone. See Wheatley v. Ford, 679 F.2d 1037, 1040 (2d Cir.1982); Milwe v. Cavuoto, 653 F.2d 80, 82-83 (2d Cir.1981). The Ninth Circuit has narrowed the authority of Buxton. See Hamner v. Rios, 769 F.2d 1404, 1407 (9th Cir.1985).
 
 
 [1]
 Before determining whether indecent material as defined in the Cable Decency Act, Utah Code Ann. Sec. 76-10-1702(4) (see the Per Curiam Opinion at 990, n. 1), may be regulated, it is helpful to consider a narrower definition of indecency developed by the F.C.C. in Pacifica Foundation, 56 F.C.C.2d 94, 98 (1975), on reconsideration, 59 F.C.C.2d 892 (1976), rev'd, Pacifica Foundation v. F.C.C., 556 F.2d 9 (D.C. Cir.1977), rev'd, 438 U.S. 726, 732, 98 S.Ct. 3026, 3031, 57 L.Ed.2d 1073 (1978). The legislative history of the Cable Communications Policy Act of 1984 indicates that Congress was aware of the concept of indecency in the context of the Pacifica decision. H.R.Rep. No. 934, 98th Cong. 2d Sess. 69-70, reprinted in, 1984 U.S. Code Cong. & Ad. News 4655, 4706-4707 ("The Committee notes that the Supreme Court has held with respect to over-the-air that broadcasting speech which is not obscene, but nevertheless is 'indecent', may be subject to government-imposed time place and manner restrictions due to the unique prevasiveness [sic] of the over-the-air broadcast medium. FCC v. Pacifica Foundation, 438 U.S. 726 [98 S.Ct. 3026, 57 L.Ed.2d 1073] (1978)."). The F.C.C.'s concept of indecency in Pacifica is carefully considered, is tailored to the nature of the audience receiving television or radio service and seems to balance the right of the government to protect the welfare of children while not substantially interfering with the viewing rights of adults. Thus, indecency may be defined as a description or depiction, which is patently offensive as measured by contemporary community standards for the broadcast medium, of sexual or excretory activities or organs, at times of the day when there is a reasonable risk that children may be in the audience. Pacifica Foundation, 56 F.C.C.2d at 98. An important limitation on this concept is that a patently offensive description or depiction with literary, artistic, political or scientific value could be broadcast, preceded by warnings, during the late evening hours when the number of children in the audience was minimized. Id. at 98-100
 
 
 [2]
 A cable operator is "any person or group of persons (A) who provides cable service over a cable system and directly through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." 47 U.S.C. Sec. 522(4)
 
 
 [3]
 The Cable Decency Act proscribes the knowing distribution of indecent material as a continuing course of conduct:
 76-10-1703. Distribution of indecent material as nuisance.
 A person shall be deemed to have maintained a nuisance when, as a continuing course of conduct, he knowingly distributes indecent material within this state over any cable television system or pay-for-viewing television programming.
 The statutory definition of distribution under the Utah Act is very broad and includes the transmission and retransmission of cable signals, without regard to whether an operator maintained editorial control over programming.
 76-10-1702. Definitions.
 (2) "Distribute" means to send, transmit, retransmit, telecast, disseminate, or cablecast by any means, including by wire or satellite, or to provide material to send, transmit, retransmit, telecast, disseminate, or cablecast.
 Thus, to the extent that the Utah Act could be used to impose civil liability on a cable operator for indecent programming over which he has no editorial control, the Utah Act is preempted. 47 U.S.C. Sec. 558.
 
 
 [4]
 The franchising authority means "any governmental entity empowered by Federal, State or local law to grant a franchise." 47 U.S.C. Sec. 522(9)
 
 
 [5]
 47 U.S.C. Sec. 544(d) provides:
 Cable service obscene, indecent or otherwise unprotected by Constitution
 (1) Nothing in this subchapter [V-A] shall be construed as prohibiting a franchising authority and a cable operator from specifying, in a franchise or a renewal thereof, that certain cable services shall not be provided or shall be provided subject to conditions, if such cable services are obscene or are otherwise unprotected by the Constitution of the United States.
 2(A) In order to restrict the viewing of programming which is obscene or indecent, upon the request of a subscriber, a cable operator shall provide (by sale or lease) a device by which the subscriber can prohibit viewing of a particular cable service during periods selected by that subscriber.
 (B) Subparagraph (A) shall take effect 180 days after the effective date of this subchapter.
 
 
 [6]
 Utah Code Ann. Sec. 76-10-1206 (1978 Rep. Vol.) provides in pertinent part:
 Dealing in harmful material to a minor.--(1) A person is guilty of dealing in harmful material when, knowing that a person is a minor, or having failed to exercise reasonable care in ascertaining the proper age of a minor, he:
 (a) Knowingly distributes or offers to distribute, exhibits or offers to exhibit, any harmful material to a minor; ...
 The definition of harmful to minors contained in Utah Code Ann. Sec. 76-10-1201 (1978 Rep.Vol.) reflects the idea that what is not obscene as to adults may well be so as to minors:
 Definitions.--For the purpose of this part:
 (11) "Harmful to minors" means that quality of any description or representation, in whatsoever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse when it:
 (i) Taken as a whole, appeals to the prurient interest in sex of minors;
 (ii) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
 (iii) Taken as a whole, does not have serious value for minors. Serious value includes only serious literary, artistic, political or scientific value for minors.
 
 
 [7]
 The district court rejected an economic scarcity rationale as a matter of law as a justification for content-based regulation like that applicable to broadcasting. 611 F.Supp. at 1112-1113. The district court did not cite Community Communications, 660 F.2d 1370 (10th Cir.1981) in its discussion, but rather relied on Home Box Office, Inc. v. F.C.C., 567 F.2d 9, 44-45 (D.C. Cir.), cert. denied 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), which takes a different approach than the Tenth Circuit case. The district court concluded that because there was a lack of physical scarcity, market forces will determine available programming and licensing authorities need not regulate the content of the channels in the public interest provided the programming is protected by the Constitution. 611 F.Supp. at 1113. This says nothing about any economic barriers to entry which might call for regulation. Of course, whether indecent programming is entitled to unlimited constitutional protection still must be determined and that is the context in which the economic scarcity issue is relevant. Whether cable television in Utah constitutes a de facto monopoly was controverted by the parties
 
 
 [8]
 Although broadcast television is not a subscriber medium, a decision to obtain a television set is a prerequisite to viewing. Moreover, broadcast television is supported, at least indirectly, by viewers who purchase the products advertised